## KEYES & Another *v.* GRANT & Another.

ERROR TO THE CIRCUIT COURT OF THE UNITED STATES FOR THE DISTRICT OF COLORADO.

Argued April 2, 1886.—Decided April 19, 1886.

When the defendant in a suit for the infringement of a patent sets up a prior publication of a machine anticipating the patented invention, and it appears that there are obvious differences between the two machines in the arrangement of the separate parts, in the relation of the parts to each other, and in their connection with each other in performing the functions for which the machine is intended, and experts differ upon the questions whether these differences are material to the result, and whether they required the faculty of invention, those questions are questions of fact to be left to the determination of the jury, under proper instructions from the court.

This was a suit at law to recover damages for the infringement of letters patent. The case is stated in the opinion of the court.

*Mr. George Harding* and *Mr. G. G. Symes* for plaintiffs in error. *Mr. Francis T. Chambers* was with them on the brief.

*Mr. Benjamin F. Thurston* and *Mr. Thomas Macon* for defendants in error. *Mr. E. T. Wells, Mr. B. T. McNeal* were with them on the brief, and *Mr. W. M. Grant* filed an argument for defendants in error.

Mr. JUSTICE MATTHEWS delivered the opinion of the court.

This was an action at law to recover damages for an alleged infringement of letters patent No. 121,385, issued November 28, 1871, to the plaintiffs for an improvement in furnaces for smelting lead and other ores. There were several defences set up by way of pleas, but the two chiefly relied on were that "the plaintiffs' pretended invention" had been described "in a certain printed publication entitled 'System der Mettallurgie,' von Dr. J. B. Karsten (published at Berlin, Prussia, in 1831–2, in 5 volumes, with an atlas of plates, I., at pages 315, 316, 317, 318, 319, 320, 321 and 322, of volume III., and pages 150 to 166, both inclusive, and 166 to 180, both inclusive, of volume V., and figures 479, 480, 481, 482, 483, 484, 473, 474, 475 on plate XXI., and figures 850 to 868, both inclusive, of plate XLI. of the atlas accompanying said work);" and, secondly, that, in view of the state of the art at the date of the alleged invention, the improvement was not patentable as not requiring the exercise of invention.

The issues came on for trial before a jury, and there was a verdict for the defendants and judgment thereon, to reverse which this writ of error is brought.

It appears from the bill of exceptions that the plaintiffs read in evidence the patent sued on, the substantial part of the specifications attached to which was as follows:

"The object of this invention is to provide a novel, simple, and improved method of tapping or withdrawing lead and other metals, when in a molten state, from the bottom of a smelting furnace, so that the metal may be obtained therefrom in a clean state, and also that the formation of hard matters or incrustations on the sides and bottom of the furnace may

be avoided. The nature of this invention consists in the use or employment of a basin of suitable dimensions, located a short distance from one side of the furnace and at a suitable elevation above the bottom of the furnace; which said basin is connected with the furnace by means of a tube which extends from the bottom of the basin to the bottom of the furnace. As the molten metal fills the lower part of the furnace it rises to the same level in the tube until it reaches the basin, from whence it may be removed as clean metal.

" To enable others skilled in the art to make and use our invention we will proceed more particularly to describe the same.

" The figure represents a sectional elevation of a portion of a smelting furnace with our improvements.

" *A* represents the furnace, which may be of ordinary or common construction. *B* is a basin of suitable dimensions, located at the top of an extension built on one side of the furnace and at a suitable elevation above the bottom of the furnace. The basin may be constructed of any material suitable for receiving and holding the molten metal. Extending from the bottom of the basin *B*, to the bottom of the furnace *A*, through the above-mentioned extension, is a tube, *C*, which connects the basin with the furnace, and which may be made of iron, clay, or other material suitable for the purpose.

" The metal as it melts falls to the bottom of the furnace; as the surface of the molten metal rises within the furnace, it rises to the same level in the tube *C* until it reaches the basin *B*, from which it may be removed with a ladle.

" The advantages of this invention are obvious, as by this means the metal is tapped or withdrawn from the furnace free from impurities, and it will also be seen that the difficulties arising from the formation of hard matter or incrustations on the bottom or sides of the furnace, occasioned by the usual method of drawing off a large quantity of molten metal at one time, are obviated.

" Having thus described our invention what we claim as new, and desire to secure by letters-patent of the United States, is—

"The method of tapping or withdrawing molten lead or other metals from a smelting furnace by means of the basin $B$ and tube or connection, $C$, in combination with the furnace substantially as shown and described."

The drawing referred to is as follows:

Albert Arents, one of the plaintiffs, testified to his own qualifications as an expert in the art of smelting, and also "that the obtaining of clean metal from the side of a furnace of ordinary construction automatically by the means described in the specifications in the patent was novel and useful, and a great improvement over the old method of withdrawing clean metal from smelting furnaces; that the specifications were sufficiently full, clear, and precise to enable persons skilled in the art to which they appertained, to wit, the art of smelting, to construct a furnace which would produce the useful result claimed by the patent, to wit, the obtaining clean metal automatically from a smelting furnace when in operation of ordinary construction; that a furnace of ordinary construction, as it existed at the date of plaintiff's patent, as defined by the art of smelting, so far as is material to this case, consisted of an inner hearth with an open breast or sump, into which the molten masses of the furnace, when fused, collected, and settled, according to their specific gravities; that the front of a smelting furnace was that part of the furnace where the slag

ran and was handled by the smelter ; that the back of the fur-
nace was opposite to the front, and that those parts of the fur-
nace to the right and left were known and called the sides ;
that the slag ran off through a spout over the open breast of
the furnace in front, and the clean metal was tapped period-
ically from a taphole at the bottom of and from the side of
the furnace ; that each part in the construction of the furnace
had its particular functions, which were important as under-
stood and known and taught in the art of smelting at that
time, to wit, the front was the working door of the furnace,
and was where the slag ran off and was handled ; the back
and sides where the tuyeres were situated, through which the
blast was forced into the furnace, and the clean metal was
periodically drawn or tapped from one side or other of the
furnace."

The plaintiff then introduced a model on the scale of one
inch to the foot, in sections, showing what a furnace of ordi-
nary construction was at the date of the patent, as known in
the art of smelting, showing the improvement of the plaintiffs
and the old mode of tapping, of which the following are draw-
ings :

*A—Section of Furnace of ordi-
   nary construction in 1871,
   showing plaintiff's device.*
*B—Basin similar to that shown in
   plaintiff's patent.*
*C—Tube connecting bottom of
   Basin with bottom of Fur-
   nace.*
*D—Section of same Furnace.*
*E—Basin to receive clean metal
   when Furnace was tapped.*
*F—Tap hole through which clean
   metal was periodically tapped
   by the old method into Basin E.*
*G—Section of same Furnace.*
*H—Inner hearth.*
*I—Forehearth or Sump.*
*K—Slag spout or exit.*
*L—Tuyere holes.*

The plaintiffs then corroborated this testimony of Arents' by that of numerous experts, and gave evidence tending to prove infringement by the defendants, and rested their case.

The defendants put in evidence certain extracts from the text and illustrative drawings of smelting furnaces of the treatise upon metallurgy by Dr. J. B. Karsten, published at Berlin in 1831–32, mentioned in the plea, translated as follows:

"(318) The fore-hearth is that part of the crucible projecting in front of the fire-walls of the furnace.

"Crucible furnaces are those shaft furnaces in which the crucible is entirely on the inside. They are divided into eye-crucible furnaces and tap-crucible furnaces. The former have an eye in the front wall from which the slag flows continuously, the metal and matte being tapped off at intervals into basins.

"The tap-crucible furnaces are those in which the metal, matte and slag are all tapped off from time to time.

"Sump-furnaces are those shaft-furnaces in which the crucible is partly in the furnace and partly in front of the furnace. The slag runs off continuously over the fore-hearth. The metal and matte are tapped off into receiving vessels or tap-basins. Sometimes the sump-furnaces are not provided with tap-basins,

and the metal in them is dipped with ladles direct from the fore-hearth.

"Spur or channel-furnaces are shaft-furnaces without a crucible. The molten contents flow through the eye directly from the furnace hearth into receiving vessels. These different furnaces can be more advantageously studied from drawings than from written descriptions.

"(319) In some countries the crucible-furnace is preferred; in others, the sump-furnace. It is not advisable to use the channel-furnace when clean metal is produced. With this furnace the metal is not protected from oxidation. It is used chiefly in smelting copper ores, with a view to producing copper matte.

"The drawings, figures 461 to 463, represent an eye-crucible furnace. The slag runs continuously through a hole in the front wall. The metal and matte are tapped off at intervals through a hole in the side of the crucible.

"The drawings, figures 464 to 466, represent an eye-crucible furnace, which differs from the former, in that the tap-hole is in the front wall and at the bottom of the crucible.

"The drawings, figures 467 to 469, represent a tap-crucible furnace. The metal, matte and slag are tapped off from time time into receiving basins.

"The drawings, figures 470 to 472, represent an eye-crucible similar to the one represented by drawings, figures 464 to 466; it is provided with two tap-basins. The slag also passes through a basin, for the purpose of allowing the small particles of metal and matte mixed with it to settle.

"(320) The drawings, figures 473 to 475, represent a sump-furnace with a covered eye, in which the brasque (a mixture of fire-clay and coke dust) under the front wall divides the sump into two communicating vessels.

"The slag runs off continuously through the eye between the bottom of the front wall and the top of the brasque partition.

"This arrangement is used when it is desired to dip the clean metal with ladles from the fore-hearth instead of drawing it off into tap-basins.

"The drawings, figures 476 to 478, represent a sump-furnace with an entirely open breast, in which the slag passes off immediately over the fore-hearth.

"The drawings, figures 479 and 480, represent a sump-furnace with a covered eye, and with a tap-basin, into which the metal and matte are tapped from the fore-hearth. This furnace might be regarded as a channel-furnace, by simply considering the short canal, or eye, which connects the sump under the shaft with the fore-hearth, as a channel. But, by means of this short canal or eye, the sump and the fore-hearth stand in combination with each other as a pair of communicating tubes or vessels; consequently, it is a sump, and not a channel-furnace. The slag may pass through the covered eye into the fore-hearth, or through an open eye above the fore-hearth, the latter eye being used exclusively for the slag.

"In smelting operations, where little or no slag is produced, the upper eye is dispensed with entirely."

The following are figures 858–860 and their scale from Plate XLI. of Karsten's Atlas: [See also pages 33 and 34.]

858

859

The defendants also introduced experts as witnesses, whose testimony tended to prove that, as stated by one of them—

" The furnaces thus figured by Karsten are planned for withdrawing the reduced metal continuously, and as fast as possible, from the oxidizing action of the blast and the intensely heated part of the slag. So, the metal is made to flow constantly outward and upward through the open eye into the fore-hearth, which is made as high as the inner crucible; and, generally, the clean molten metal alone is passing through this bottom eye. When much slag is formed it is run off separately by another eye placed higher up; when very little slag is produced it accumulates for a long time on the top of the molten metal in the inner crucible, and the clean metal in the fore-bay

860

may be partially removed many times without allowing any of the slag to escape through the eye."

One of the defendants, James Grant, was called to prove that he had constructed an experimental furnace of small size, according to the description and drawing of Fig. 860 of Karsten's publication, and worked it successfully. A model was exhibited, the proportions and features of which are shown in the following drawings :

Opinion of the Court.

A—*Horizontal section.*
B—*Fore-hearth.*
C—*Open eye.*
E—*Slag exit made by defendants,*
     *with spout over fore-hearth.*
F—*Front section.*
G—*Open eye.*
H—*Slag exit made by defendants.*
I—*Vertical section.*
K—*Fore-hearth.*
L—*Hidden eye.*
M—*Open eye.*
N—*Tuyeres.*

And his testimony was supported by that of others who had seen the furnace in operation.

On the other hand, the plaintiffs, in rebuttal, called expert witnesses, who testified that the plaintiffs' furnace, as described in the patent, differed materially from that described by Karsten, and from the model of the one made by the defendant Grant, and who pointed out in their evidence the particulars in which that difference consisted, in the construction and arrangement of the furnace, in the principle of its operation, and in the results produced.

All of the evidence on both sides having been given, the whole of which is set out in the bill of exceptions, the court having refused to charge the jury as requested by the plaintiffs, instructed the jury to return a verdict for the defendants, which was done, and to this ruling exception was duly taken, and is now assigned for error.

The judgment entered on the verdict rendered in favor of the defendants, in pursuance of the direction of the court, can be maintained only on the ground, either that the legal identity of the furnace described by Karsten with that covered by the plaintiffs' patent was manifest as a matter of law, or that it was established as a matter of fact so conclusively by the evidence that a verdict the other way could not be supported, within the rule as stated in *Randall* v. *Baltimore & Ohio Railroad Co.*, 109 U. S. 478.

Clearly it was not a matter of law that the specification of the plaintiffs' patent, and the publication of Karsten, taken in connection with the drawings intended in illustration, described the same thing. The differences were obvious, in the arrangement of the parts, and the relation of the basin in one, and the fore-hearth in the other, to the interior of the furnace, and the mode of connecting the one with the other, for the purpose of drawing the metal from the furnace. So that it certainly was not a matter of mere judicial knowledge, that these differences were either not material in any degree to the result, or, if material at all, were only such as would not require the exercise of the faculty of invention, but would be suggested by the skill of an experienced workman employed to produce the best result in the application of the well-known arrangements of the furnace. It was claimed, on behalf of the plaintiffs, that the furnace described in the patent and as used by them, embodied an idea not contained in or suggested by Karsten's publication. That idea consisted in the employment of a basin to receive the molten metal, located at a suitable elevation above the bottom of the furnace, and connected with the interior of the furnace by means of a tube, so that, instead of tapping a lead smelting furnace by withdrawing the molten metal through a tap-hole near the bottom, it was proposed to allow the metal to flow upward into the receiving basin under the operation of the familiar natural law that liquids will seek the same level in communicating vessels. The object to be attained by this arrangement was that clean metal, unaccompanied with slag or other impure products resulting from the operation of smelting lead ores, should, after settling to the bot-

tom of the furnace, by reason of its greater specific gravity, ascend through the connecting tube, as the mass of molten metal accumulates and rises within the furnace, into the receiving basin, and be dipped thence with a ladle.    It was insisted by the patentees that no such arrangement and combination were to be found in Karsten's publication or in the furnaces depicted in his figures, and that the improvement which they constituted was not the result of mere mechanical skill, but sprang from a genuine effort of invention.    And this view was supported by the opinion of many experts skilled in the art.

In our opinion this was a question of fact properly to be left for determination to the jury, under suitable instructions from the court upon the rules of law, which should guide them to their verdict.    And there was evidence upon both sides of the issue sufficient to require that it should be weighed and considered by the jury in the determination of the question, and this implies that, if it had been submitted to the jury and the verdict had been for the plaintiffs, it would not have been the duty of the court to have it set aside as not supported by sufficient evidence.    The court erred, we think, in withdrawing the case from the jury as it did by directing a verdict for the defendants.    For this error the judgment is

*Reversed and the cause is remanded, with directions to grant a new trial.*