83 N.J. Super. 1 (1964)
198 A.2d 791
FERNANDA MISANI, PLAINTIFF-APPELLANT,
v.
ORTHO PHARMACEUTICAL CORP., A NEW JERSEY CORPORATION, ET AL., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued December 2, 1963.
Decided March 11, 1964.
*8 Before Judges CONFORD, FREUND and SULLIVAN.
Miss Fernanda Misani, appellant, argued the cause pro se.
Mr. Alfred I. Manson, Jr. argued the cause for respondents other than Johnson & Johnson and Robert W. Johnson (Messrs. Pitney, Hardin & Kipp, attorneys).
Mr. Stanley C. Smoyer argued the cause for respondents Johnson & Johnson and Robert W. Johnson.
The opinion of the court was delivered by CONFORD, S.J.A.D.
Plaintiff, formerly employed by defendant Ortho Pharmaceutical Corp. as a research chemist, brought this action for damages by reason of Ortho's designation of a different person as "inventor" in its application for a patent which eventually was issued to it on a pharmaceutical compound, the idea, manufacturing process and novel use of which were allegedly discovered by plaintiff. The gravamen of the suit is that defendant's action thereby deprived plaintiff of professional credit for the invention. The complaint and pretrial order also assert injury to plaintiff's alleged property rights in the invention by improper and deficient preparation and prosecution of the patent application. Joined as defendants in the action were one Oroshnik, plaintiff's direct superior at Ortho, who was designated as inventor in the patent afore-mentioned, and certain other supervisory employees of the company, as well as Ortho's parent corporation, Johnson & Johnson, and its board chairman, Robert W. Johnson, who were charged to have participated in the alleged wrongful acts through a Dr. Kell, patent attorney for Johnson & Johnson.
Defendants denied the allegations of the complaint, asserted that Oroshnik, not plaintiff, invented the compound, and contended that plaintiff had assigned her property rights in the patent to Ortho and that her asserted right of credit was valueless in any event because the patent itself was invalid.
*9 The action was tried before a judge and jury in the Law Division. Plaintiff, not a lawyer, tried her case pro se. At the close of plaintiff's case there was a dismissal by the court for lack of proof as to the defendants other than Oroshnik, Ortho and Johnson & Johnson. There is no demonstration of error on this appeal in that action, and it is herewith affirmed. The jury returned a verdict of no cause of action as to the defendants who remained in the case. Plaintiff's appeal advances numerous claims of error in rulings on proffered evidence, determinations of law during the proceedings, errors and deficiencies in the charge to the jury, and prejudicial conduct of the judge in trial of the case.
Preliminarily, note should be taken of the fact that plaintiff was unsuccessful in a prior action against the same defendants, claiming, inter alia, wrongful discharge from her employment with Ortho. We heretofore affirmed a judgment for defendants in that case, which was tried by a Law Division judge sitting without a jury, wherein it was held that the employment contract was at will, terminable by either party with or without cause. Misani v. Ortho Pharmaceutical Corp. (unreported, App. Div., May 18, 1962), certification denied 38 N.J. 304 (1962).
Plaintiff, who is holder of a doctorate in organic chemistry, was employed by Ortho in January 1955 after she responded to an Ortho advertisement seeking an organic chemist to perform "research in synthetic medicinal chemistry" of "basic character." The following month she executed an agreement with Ortho providing in part as follows:
"FERNANDA MISANI FIORDALISI
(hereinafter called `Employee'), in consideration of his employment, and of wages and salary paid, hereby assigns, and agrees to assign to
ORTHO PHARMACEUTICAL CORPORATION
(hereinafter called `Company'), or its nominee, their successors or assigns, all his rights in inventions improvements and ideas which during the period of his employment, he has made or conceived or may make or conceive, either solely or jointly with others, in the course of his employment, or in the Company's time, or with the Company's material or facilities, or relating to any subject matter *10 with which his work for the Company is or may be concerned, or relating to any business in which the Company or any of its subsidiary or affiliated companies is involved. * * *"
Plaintiff gave testimony at the trial of the following general import. Before joining Ortho she had had experience in the preparation and synthesizing of barbiturates, among other therapeutic compounds. Specifically, she had worked with 4-4 disubstituted pyrazolones (the substance of the compound in dispute) and she had a number of scientific patents and publications to her credit. About July 1955 she began to use her spare time at Ortho in research on a problem which had long defied organic chemists although considerable work had been done on it  the making of a substance which would contain the beneficial qualities of barbiturates but not their undesirable toxic and habituating characteristics. It is her contention in this case that she succeeded at Ortho in doing so, and that the patent issued to Ortho by the U.S. Patent Office on March 17, 1959 in the name of William Oroshnik as inventor (No. 2,878,263), claiming the compound, "4-methyl-4 phenyl-5-pyrazolone," resulted from her discovery of that compound and her invention of the process of making it, also disclosed in the patent but not claimed therein independently of the compound.
Plaintiff testified that Oroshnik discouraged her efforts on the barbiturate project, but she persisted. She offered in evidence notebook entries indicating preliminary unsuccessful experiments. On January 26, 1956, at a company seminar at which Oroshnik was present, as indicated by one of her working notebooks introduced in evidence, plaintiff disclosed the idea and the process for making the compound to those in attendance. Plaintiff explained in her testimony that the novelty of the process lay in the use of an acid in the final step of the production of an intermediate. She had made a search of the literature and testified it showed no "well known" process for making the intermediate at all.
Oroshnik, also a skilled research chemist, told quite a different story on the stand. He testified that at the time of *11 plaintiff's employment at Ortho he was trying to create an anti-convulsant which would be an improvement over one then on the market. He stated that this field was one of his specialties. He directed plaintiff to salvage a common intermediate from an unsuccessful uracil project and combine it with hydrazine. She did this, and arrived at the yield of the pyrazolone compound which he was after  the subject matter of the patent. Although she worked out the details of the process, this was what he would expect of any senior chemist functioning under his direction and possessing basic chemical know-how.
Oroshnik also testified that some time after the termination of plaintiff's association with Ortho some 40 or 50 compounds, including that here in question, were sent to Dr. Kell, a Johnson & Johnson patent attorney and chemist who handled patent matters for Ortho as well. Oroshnik told Kell he conceived the idea for the pyrazolone compound and had directed plaintiff to make it, but he did not tell Kell he was the inventor of the compound or process. Kell testified that Oroshnik told him these facts and that he, Kell, then concluded that Oroshnik was the inventor and arranged for the patenting of the compound.
A patent expert, McLean, testified on behalf of defendants that the patent was invalid because the formula of the compound was anticipated by a reference in Beilstein, a German chemical encyclopedia. He also undertook to refute plaintiff's position to the effect that if the patent claim on the compound was invalid, the process of manufacture was nevertheless novel and patentable independently, and that the patent claim could be validated also by amending it in the form of a claim for a method of treating convulsions by use of the compound. (We discuss the legal merits of these contentions infra.) McLean said the process of manufacture was neither novel nor patentable, citing a number of supposedly supporting German publications which defendants offered in evidence (untranslated). McLean also gave the opinion that the suggested amendment of the patent claim as *12 one for a proposed use for treatment of convulsions would not render it valid.
At the trial plaintiff also offered evidence of Ortho's attempt to secure a Canadian patent on the process, as an admission against its position in this case, notwithstanding Ortho later withdrew it. She complains of the refusal of the trial judge to charge on the point. She also claims error in the court's refusal to allow in evidence a United States patent examiner's communication to her on a later application of her own to secure a patent on the process for the pyrazolone compound.
A previous interference proceeding brought in the United States Patent Office by plaintiff in relation to the Ortho patent based on her alleged priority in invention as against Oroshnik was dissolved by the agency on its own motion on the ground that the compound was not patentable by reason of anticipation by the Beilstein reference and the effect of 35 U.S.C.A. § 102, which precludes a patent where the invention has been patented or described in a printed publication in any country more than one year prior to the date of the application for patent in the United States.

I.
One of plaintiff's principal appellate contentions is that the trial judge erred in ruling, early in the case, that ownership of the invention or inventions here involved, as distinguished from any right of plaintiff to professional credit for them, vested in Ortho absolutely by virtue of the assignment agreement executed by plaintiff quoted above, and that consequently the company was free to use or discard these discoveries or to patent them or scrap them, wholly or partly, at its unfettered will. We think the broad language of the contract, fairly construed, clearly requires this construction. Compare Vargas v. Esquire, Inc., 164 F.2d 522 (7 Cir. 1947). Plaintiff contends, alternatively, that the assignment agreement is unenforceable as inequitable because *13 the contract of hire was for no fixed term. Where, as here, an employee is engaged for purposes of research and invention, it is generally held that an assignment agreement by the employee of the tenor of that here involved will be upheld and enforced. Patent & Licensing Corp. v. Olsen, 188 F.2d 522 (2 Cir. 1951); Paley v. DuPont Rayon Co., 71 F.2d 856 (7 Cir. 1934); Annotation, 153 A.L.R. 983, 998 (1944). It makes no difference that the agreement of hiring is not for any fixed term. Goodyear Tire & Rubber Co. v. Miller, 22 F.2d 353 (9 Cir. 1927), reversing the lower court decision relied upon by plaintiff, reported in 14 F.2d 776 (S.D. Cal. 1926). But see Triumph Electric Co. v. Thullen, 228 F. 762 (E.D. Pa. 1916), affirmed on a narrower ground in 235 F. 74 (3 Cir. 1916).
Even apart from the express agreement of assignment, however, the invention became the property of Ortho as a matter of law, since it is indubitable that "the inventor was engaged specifically to exercise [her] inventive faculties for the employer's benefit," and the specific idea and process here assertedly conceived by plaintiff were undeniably developed while at work for Ortho. Kinkade v. New York Shipbuilding Corp., 21 N.J. 362, 369 (1956); International Pulverizing Corp. v. Kidwell, 7 N.J. Super. 345 (Ch. Div. 1950); Standard Parts Co. v. Peck, 264 U.S. 52, 44 S.Ct. 239, 68 L.Ed. 560 (1924).
Plaintiff also argues that enforcement of the contract against her is improper because she was wrongfully discharged. But this contention is barred by the decision of the previous case against her on that point. The issue is res judicata.
Plaintiff's further contention that such enforcement of the contract violates the federal constitutional provision on patents is frivolous.
We consequently hold the view that the trial court was right in ruling that insofar as plaintiff's claim was postulated on the theory that she owned the inventions of the compound or process, or the idea of patenting the use of the compound *14 as an anti-convulsant, it was groundless. She legally parted with that title anticipatorily when she took the job as a research chemist employed to make such discoveries and when she executed the assignment. Ortho owed her no duty to patent, or refrain from patenting, these inventions or any aspect of them, or, if it did apply for patents, to do so properly or adequately, or to repair any deficiency in the patent issued, by amendment or otherwise.

II.
Defendants have made no serious refutation of the proposition that if plaintiff did legally invent the compound and the process for making it, she possessed a professional right of intellectual credit therefor even though she assigned "all [her] rights" in inventions, ideas, etc., to Ortho, and that a wrongful deprivation of that credit by publishing the formula and process in a patent as the invention of another would constitute an actionable tort. In the present case the patent issued to Ortho in the name of Oroshnik as inventor, although claiming only the compound, also published the process and the idea of treating convulsions with the compound, thereby imputing all to his inventorship. But the trial court, although purporting to submit the issue of credit to the jury, expressed an opinion out of the presence of the jury that there was no such right, and we think it advisable that we lay the question to rest.
We are of the view that such an action lies, at least as respects patentable inventions or discoveries, and that plaintiff did not in any way surrender her rights in that regard.
It is of the essence of the patent law and public policy that a patent must be applied for in the name of the true inventor only, whether issued to him or to his assignee. 35 U.S.C.A. § 102(f); 69 C.J.S. Patents § 84, pp. 377, 378; Kennedy v. Hazelton, 128 U.S. 667, 672, 9 S.Ct. 202, 32 L.Ed. 576 (1888). The recognition of such a cause of action as is presently here under discussion obviously subserves the *15 stated policy and tends to prevent an imposition upon the public.
Moreover, vindication of the claim to credit on the part of the aggrieved true inventor is readily assimilable to the principle of an action for interference with prospective economic advantage now thoroughly established in our law. Mayflower Industries v. Thor Corp., 15 N.J. Super. 337 (Ch. Div. 1951), affirmed o.b. 9 N.J. 605 (1952). As succinctly summarized recently by the Chief Justice, "The law protects also a man's interest in reasonable expectations of economic advantage." Harris v. Perl, 41 N.J. 455, 462 (1964).
Notwithstanding the fact that the area of direct economic exploitation of the invention itself has by the relationship of the parties and their agreement been appropriated exclusively unto Ortho, nevertheless plaintiff, if the true inventor, retained the valuable right of accretion to her reputation as a research scientist in organic chemistry of credit for the invention if any patent should be issued and published in connection therewith. All contemplated advantages to the company from the plaintiff's assignment of inventions and ideas were fully and reasonably utilizable by it without the need to misrepresent the inventor on a patent application. It would be unreasonable and against public policy to construe the contractual assignment as a consent by plaintiff to an abrogation of her right of credit by means of the false attribution of inventorship in the published patent to another who was not the true inventor. Compare Vargas v. Esquire, Inc., supra, 164 F.2d 522, where an artist specifically assigned all rights to his pictures and to use of his name as artist.
General understanding of the foregoing assumptions by the business and scientific community is apparent.[1]
*16 The rationale of plaintiff's cause of action may also be supported by the analogy of an action for slander of title, in that both rest upon publication by defendant of an untrue statement which has the effect of disputing plaintiff's rightful claim to ownership of something. See Frega v. Northern New Jersey Mtg. Ass'n, 51 N.J. Super. 331, 337-338 (App. Div. 1958). The difference, however, is that in slander of title the protected interest is the vendibility of the subject matter of the title, whereas credit for a patentable invention is not alienable.

III.
As indicated, defendants contended at the trial that assuming plaintiff had a right to credit as inventor of the compound, as distinguished from proprietorship of the invention itself, and assuming further that she rather than Oroshnik was the inventor, she sustained no damage (or less damage than otherwise) from any deprivation of that credit by defendants' actions, since the patent was invalid because anticipated by the published Beilstein reference. Indeed, their argument predicated on this point was that there was no substantial claim to credit even involved in the case. We find that the statute cited above, 35 U.S.C.A. § 102(b), concludes the issue in respect of the narrow question of the validity of the patent claim to the compound itself. It provides that a patent is not issuable if "the invention was patented or described in a printed publication in this or a foreign country * * * more than one year prior to the date of the application for patent in the United States." The Beilstein reference was in fact published more than one year prior to *17 Ortho's application for this patent. Plaintiff conceded at the trial that the patent on the compound per se was invalid.
To the limited extent indicated, therefore, defendants' position is correct, and their point with respect to damages and the substance of a claim, insofar as the value of the inventorship credit depends upon the validity of the patent claim to the compound itself, was well taken.

IV.
But plaintiff argues that inventorship of the basic idea, including the process and the use of the product as an anti-convulsant, was not determinable against her under the thesis that the claim for the compound per se was not patentable and that the patent as issued was invalid to that limited extent. She soundly argues that inventorship comprehends not alone the conception of a novel idea but reducing it to practice. Application of Schlittler, 234 F.2d 882, 43 C.C.P.A. 986 (1956). The Beilstein reference was merely to what plaintiff describes as a "type" formula. It did not reveal the properties, uses or the process for making the substance. As will be seen, infra, claims for a process of manufacture or for a new use of a known compound are patentable independently of the compound itself.
Although patentability of the basic invention in either of the respects last noted was stressed by plaintiff below and here primarily in terms of the effect of the trial court's rulings on the question of inventorship as between herself and Oroshnik and of defendant's asserted duty to perfect its patent, we find greater pertinence thereof in terms of the effect of such rulings on the jury's resolution of the issue of whether plaintiff had a cause of action at all independently of her contest vis a vis Oroshnik and of whether her claim was one of any value. For reasons to be stated, we find error in the trial court's handling of these issues, and this requires a reversal and retrial, notwithstanding some degree of imperfection in plaintiff's communication of her position on the points to the *18 court. We so determine partly because the issues mentioned were recognized by the court and the parties and can be said to have been tried, and partly because the interests of a just resolution of this controversy so require.
The patent statute provides that an application for a patent must contain a specification incorporating "a written description of the invention, and of the manner and process of making and using it, * * *. The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C.A. §§ 111, 112. The patent protection is confined to the claim or claims stated, which may be limited to the compound or apparatus, or to the process, or may claim both. Continental Paper Bag Co. v. Eastern Paper Bag Co., 210 U.S. 405, 418-419, 28 S.Ct. 748, 52 L.Ed. 1122 (1908); Hall v. Keller, 180 F.2d 753 (5 Cir. 1950), certiorari denied 340 U.S. 818, 71 S.Ct. 48, 95 L.Ed. 601 (1950). Notwithstanding the application describes both the compound and the process, the patent coverage is confined to what is expressly claimed as the invention.
By virtue of an amendment of the patent statute in 1952 patentable processes now include "a new use of a known process, machine, manufacture, composition of matter or material." 35 U.S.C.A. § 100(b). Rohm & Haas Company v. Roberts Chemicals, 245 F.2d 693 (4 Cir. 1957). Previously, as noted by the court in Rohm & Haas Company, it was the "settled rule that a new use of an old product was not patentable." (at p. 698) The former rule is illustrated by In re Thuau, 135 F.2d 344, 30 C.C.P.A. 979 (1943). That decision, relied upon by defendants here, is obviously no longer the law in view of the amendment of the statute and the illustration of its effect in Rohm & Haas Company, supra. Matter of Application of Hack, 245 F.2d 246, 44 C.C.P.A. 954 (1957), cited by defendants as sustaining the old rule, cannot properly be understood as doing so in view of the acknowledgment therein of the unambiguous language of the statute as it now stands. The Hack case holds no more than *19 that a patent sought in respect of a new use for an old product must be claimed in the form of a process claim, not a composition claim.[2]
The Ortho patent in the present case, as already seen, claimed only the compound. The patent, although not the claim, included a description of the process as well as a detailed statement of the scientific basis for the conclusion expressed therein that the "novel compound" claimed "possesses particular value as an anti-convulsant and is useful in the treatment of epilepsy." It is clear, therefore, as a matter of law, that plaintiff was prima facie right when she repeatedly contended below, as she does here, that the invalidation of the claim for the compound per se by the Beilstein reference would not have affected a claim either on the process of making the compound or the "process" of the new use of the presumably known compound as an anti-convulsant, had either or both of such claims been incorporated in the original patent or added thereto by reissue. This assumes, of course, existence of the basic patent requirements of inventive novelty, utility and reduction to practice in such claims, and, so far as anything to the contrary may be deemed argued below or on this appeal by defendants, a jury issue as to satisfaction of such requirements was presented by the proofs.
The trial court early in the proceedings below, after ruling against plaintiff on her claim for property rights in the invention, *20 expressly retained for trial the issue of improper representation by the patent of the process as the invention of Oroshnik rather than plaintiff, and stated in that regard that its patentability as "new, whether it was an invention" was relevant to the question of damages. Defendants sought to meet the issue by testimony of a patent law expert to the effect that any chemist conversant with the prior literature on the subject could have made the compound by the process plaintiff used and that it was therefore neither novel nor a patentable invention. Plaintiff testified that no one had made the specific compound  the "gem pyrazolone"  as distinguished from other pyrazolones, and that her use of an acid in the final stage of an intermediate was novel. This was not specifically controverted by defendants.
In relation to the patentability of the process, plaintiff requested the court to charge the jury that "A process is novel and patentable even if it is a combination of old elements, as long as the result is new and useful." So far as it went, this was a correct statement of the applicable law on the particular proposition thus enunciated. See Respro v. Vulcan Proofing Co., 1 F. Supp. 45, 51-52 (E.D.N.Y. 1932); Copease Mfg. Co. v. American Photocopy Equipment Co., 298 F.2d 772, 781 (7 Cir. 1961). It was peculiarly relevant to the particular issue raised by defendants, and the general subject matter should therefore have been incorporated in the charge when the court was dealing with the dispute as to patentability of the process. This is so even though, in the light of the testimony adduced by defendants, the requested charge would have had to be qualified to the extent that the combination should not be obvious to one having ordinary skill in the art. Standard Brands v. National Grain Yeast Corp., 308 U.S. 34, 38, 60 S.Ct. 27, 84 L.Ed. 17 (1939). Nothing on this particular aspect of the law is to be found in the charge at all. See State v. Abbott, 36 N.J. 63, 68 (1961).
What the court did say to the jury anent the process was the following:
*21 "She makes some additional claims. She says that even if she did not invent the product or even if it was not patentable, which, of course, it was not, she invented the process, the means by which it was made. Her complaint is that the company got a patent on her product, that's what she is here for, complaining about, the company did not and Dr. Oroshnik did not and Dr. Kell did not and Johnson & Johnson did not get any patent upon the process, upon the means by which this thing was made. They didn't apply for a patent. She says they should have. She says they should have done so.
She has no right to tell them that they must do it. They own it, whether she invented it or whether she didn't invent it, they own it. She did it on their time with their material and they can throw it out the window if they like, as far as she is concerned. * * * The only thing she is interested in is her name on the thing, if she has a right to that.
Mr. McLean testified as an expert that the process is not an invention. It is not new and there is nothing patentable in it. It is a part of the general knowledge of chemistry available to everybody who studies the art. For this purpose he produced excerpts from chemical journals and other publications to show that all of the procedures described by Dr. Misani had been known before she used them.
Now, frankly, I don't see how you or I, as a practical matter, can decide on our own judgment whether he is right or whether he is wrong. I don't understand these publications, and some of them are in German, which makes it twice as hard. You tell me none of you read German. So I don't know what you are going to do with it. I suppose it comes down to this: You either have to believe Mr. McLean or you have to believe Dr. Misani. That is about what it comes down to, as far as that goes.
Of course, Dr. Misani, if she thought that Mr. McLean was wrong, could have produced an expert to contradict him. She did not do so, for whatever reason I do not know.
As far as that process is concerned, frankly, I don't see anything in it at all and I can't really see what claim she has." (Emphasis added)
In the light of the pertinence of the issue of patentability of the process, as seen above, there are several prejudicially erroneous aspects of the foregoing comments. While the court was abstractly correct in telling the jury that plaintiff had no right to have the defendants patent the process insofar as any right of property on her part in the process was concerned, that subject was extraneous to the issues remaining on trial by the time of the charge, since the court had earlier ruled out any property rights of the plaintiff in *22 any aspect of the invention. A simple statement to the jury that the court had so ruled would have sufficed. But since patentability of the process remained in the case in relation to the issue of damages (and, as defendants claimed in their summations, in relation to the gravamen of any claim for deprivation of credit at all; see infra), it was incumbent on the court to instruct the jury on the law relative to patentability of a process so that they might apply it to the disputed proofs and arrive at a properly considered conclusion. See, e.g., Keyes v. Grant, 118 U.S. 25, 36, 6 S.Ct. 974, 30 L.Ed. 54 (1886); cf. Philp v. Nock, 84 U.S. 460, 462, 21 L.Ed. 679 (1873). Resolution of the issue was not a simple matter of whether to "believe" defendants' expert or the plaintiff. And the absence of guidance of the jury in this regard was compounded by the court's informing them that it saw nothing in the claim in relation to the process.
Moreover, the animadversion concerning plaintiff's failure to call an "expert" to refute McLean was, in our judgment, not fully warranted. While plaintiff's position as a party naturally affected her credibility (as, of course, did also Oroshnik's), yet the comment could have been prejudicial to plaintiff. The issue of patentability of the process involved mixed questions of fact and law. On the facts, including novelty, prior art and the basic chemistry involved, plaintiff, as an advanced expert in chemistry, was presumably at least as competent as McLean. On the law, the ultimate guide to the jury was or should have been the court, even assuming propriety of testimony by the patent-lawyer witness. See 3 Walker, Patents (1937) § 747, p. 2052.
The availability of patent law experts in cases directly or collaterally involving determinations of patentability does not minimize the function of the court in instructing a jury as to the law. The question of patentability is ultimately one of law. Great A. & P. Tea Co. v. Supermarket Equip. Corp., 340 U.S. 147, 155, 71 S.Ct. 127, 95 L.Ed. 162 (1950) (Douglas, J., concurring); Bergman v. Aluminum Lock Shingle Corp. of America, 251 F.2d 801, 803 (9 *23 Cir. 1957); Armour & Co. v. Wilson & Co., 274 F.2d 143, 151-157 (7 Cir. 1960). This is because patentability is a "constitutional standard," Great A. & P., ubi cit., supra, reduced to a problem of statutory construction as a result of the listing of the elements of that standard in 35 U.S.C.A. §§ 102, 103. Armour & Co. v. Wilson & Co., supra, 274 F.2d, at p. 156. Involved in the determination of patentability, however, is also, generally, the resolution of questions of fact, such as the state of the prior art, the nature of the inventor's discovery, and whether that discovery is novel or anticipated by the prior art. Armour & Co., ubi cit., supra; Cee-Bee Chem. Co. v. Delco Chemicals, 263 F.2d 150, 153 (9 Cir. 1958); Bergman v. Aluminum Lock Shingle Corp. of America, supra, 251 F.2d, at pp. 809-813 (Pope, J., concurring). Those are peculiarly the appropriate areas of testimony by patent experts. See Winans v. N.Y. & Erie R. Co., 21 How. (62 U.S.) 88, 100-101, 16 L.Ed. 68 (1859).
Helpful instructions to a jury in a case such as this, in relation to patentability of the process, would, therefore, be such as specifically required the jury to determine what had been accomplished and taught by the prior art, what if anything it was that plaintiff discovered with regard to the process, and the relationship of her discovery to such prior art. Ideally, the evidence in the case should have been brought by the court into focus as it reflected on the determination of those issues.[3]
Our reversal in this case in relation to the matter of patentability of the process is not based, however, on the absence of an ideal charge on the law in this admittedly technical and complex area, but on the failure of the instructions to make such minimal exposition of the applicable law relevant to the issue, including the general subject matter of plaintiff's request, as would enable the jury properly to discharge its *24 function other than by sheer reaction to the personalities of plaintiff and the opposing expert.
We next consider the failure of the trial court to charge the jury the law respecting patentability of the invention in respect of a novel use claim, particularly in the light of its frequent comments during the trial that amending the patent claim for that purpose was no concern of plaintiff. Agreed that insofar as plaintiff was claiming a duty to her by defendants to perfect the original patent claim, she was wrong. But insofar as the claim to deprivation of credit was concerned, patentability of a novel use claim had the same materiality to the issues as patentability of the process and of the compound. The use of the product for treatment of convulsions was plainly stated in the patent, and the representation of Oroshnik as inventor fairly extended to that feature of the disclosure as well as to the compound itself and the process. Defendants clearly recognized this aspect of the issues, as they were at pains to have their expert McLean testify that adding a use description to the claim would not validate it. McLean, however, relied on In re Thuau, supra, but we have seen that the effect of that decision was overcome by the 1952 amendment of the statute permitting process claims in the form of new uses of known compositions if framed as such. To the extent that defendants consistently contended that plaintiff's claim to credit was groundless and valueless because there was no patent validity in her invention,[4] she had the right to attempt to show the contrary by proving that what was disclosed *25 in the patent and attributed to the inventorship of Oroshnik contained patentable subject matter.
All that the trial court said to the jury in relation to the issue of patentability of the invention as a process or method claim for the new use of the compound as an anti-convulsant was this:
"I have already mentioned the fact that Dr. Misani has repeatedly pressed the idea that Ortho could get a good patent if they changed the wording of the claim; and we have had evidence that they couldn't. Well, frankly, it doesn't make any difference whether they could or whether they couldn't. That is not what the suit is about. As I told you before, that's none of her business."
Not only did this constitute a failure to instruct the jury on the applicable law, but it took the issue of patentability of the alleged new use out of the case completely. And this notwithstanding defendants had recognized its materiality in relation to the value and gravamen of plaintiff's claim of deprivation of professional credit, as distinguished from a property right in the invention, and had offered testimony on the issue pointed to that aspect of the claim. This was error, and we regard it as clearly prejudicial to plaintiff.
One of plaintiff's requests to charge included a reference to remedying defects in the patent by additional claims for matter disclosed in the patent. In her exceptions to the charge she made substantially the same objection to the omissions in the charge in respect of this point as we have voiced. Although the request to charge was incomplete and formally defective and as such was properly refused by the court, it nevertheless was sufficient, in the background of the controversy as a whole and the importance of the specific point to a just resolution of the lawsuit, to have served to alert the court to the necessity of charging the jury on the law concerning patentability of claims for new uses of known compositions. Considering also the exceptions, it was error to fail to do so. See State v. Abbott, supra, 36 N.J., at p. 68; Grammas v. Colasurdo, 48 N.J. Super. 543 (App. Div. 1958); Cf. Kreis v. Owens, 38 N.J. Super. 148 (App. Div. 1955).
*26 Defendants urge that any deficiencies in the charge in either of the respects here found faulty are immaterial, in that the verdict of the jury reflects they found Oroshnik rather than plaintiff to have been the inventor. This argument is premised on part of the court's charge as to damages. The court said, in part:
"If, on the other hand, you should decide in favor of the plaintiff against any of the defendants, then you will have to decide how much.
She claims two kinds of damages. She claims compensatory damages. She says, my reputation, my good name suffered because I didn't have the credit for this that I did. She brings no proof of any special burden to her, any special loss of money. But in this type of case if indeed you were to find that she had suffered a diminution of her scientific reputation[5] through the wrongful acts of any of these defendants, you may allow her such reasonable sum as will compensate her for that loss of reputation.
Of course, you don't have much to go on in the case; there isn't much testimony. You just have to take the general picture and see what you come up with. If you can't find anything else, you could bring in nominal damages, just if you think she was right but she didn't get hurt. Why, you could, I suppose, bring in a dollar or something like that. Of course, you don't get to that question unless you find in her favor." (Emphasis added)
The rule is that ordinarily a verdict of no cause of action may connote either no liability or no damages. Kovacs v. Everett, 37 N.J. Super. 133 (App. Div. 1955), certification denied Kovach v. Kovacs, 20 N.J. 466 (1956); Carianni v. Schwenker, 38 N.J. Super. 350, 356 (App. Div. 1955). A conclusion that the verdict here necessarily meant a finding of no inventorship by plaintiff vis a vis Oroshnik is not compelled by the trial court's instructions. These did not purport to make mandatory a return of nominal damages in the event of a determination of inventorship in plaintiff but no substantial *27 damages. Nominal damages were by clear inference left optional with the jury.[6]
But of even more importance, defendants emphasized throughout the case and particularly in summation, as already indicated, that since plaintiff was not a first inventor of anything (even if she had priority as against Oroshnik) and thus had no patentable invention, her claim to credit lacked any real substance as well as value. Failure on the part of the jury because of absence of pertinent instructions in the charge to understand that the inventions disclosed in the patent could be patentable, and thus presumably valuable, with consequential value in the professional credit of inventorship thereto, could readily have been a contributory factor in the determination of the jury to reject the claim of credit completely, whatever they might have thought of the matter of priority as between plaintiff and Oroshnik inter sese. Supporting the likelihood of this is the emphasis in the charge of the invalidity of the patent as issued because of the Beilstein reference and the pervasive undertone in the charge as a whole of lack of merit in plaintiff's entire claim.[7]
Defendants have also argued that plaintiff cannot be deemed to have been damaged by any misrepresentation of her inventorship in the Ortho patent because she has since the trial of this action obtained a patent on the process. In the first place, the record before us does not include that fact. But even plaintiff's concession (indeed she disclosed this fact in her brief) that she now has the process patent will not eliminate the issue of deprivation of credit at the retrial. This is so for several reasons.
During at least the period between the issuance of the Ortho patent and that to plaintiff there was, if plaintiff *28 was truly the inventor, a continuing tort of misrepresentation as to her inventorship. We cannot say that the presumptive damage then done her was necessarily erased automatically by the later patent to plaintiff. Further, the coexistence of both patents casts a substantial cloud on plaintiff's reputation as the true inventor. Ortho could have eliminated this by disclaiming its patent, 35 U.S.C.A. § 252, or amending to show plaintiff as inventor, but it has chosen not to do either. Finally, since Ortho owns the process invention under the assignment from plaintiff, it can at any time and presumably will eventually exercise its rights and compel assignment of the process invention to itself. At that point there will be no impediment to its disclaimer thereof and consequent elimination of the asserted preservation of plaintiff's reputation as the inventor.
Defendants thus have not shown that the present existence of a patent in plaintiff's name negates damage to her.
We might at this point with an eye to the impending retrial state our concurrence in the trial court's instruction to the jury that they could allow plaintiff compensatory damages even though she could demonstrate no specific special damages. The problem is somewhat comparable to that of allowability of substantial (not punitive) damages in an action for libel per se. Moreover, the approach of the courts is liberal in relation to a wronged plaintiff where the very nature of the subject matter makes proof of specific damages difficult. Here, the loss from impaired reputation for inventorship is highly correlative with the value of the patent. In the case of patented pharmaceutical products it ordinarily takes a long time to test and evaluate them and get government approval for their marketing. This should not preclude an award of reasonable damages for wrongful deprivation of credit in the interim. Compare the allowability of substantial damages on behalf of parents in an action for the wrongful death of a young child. McStay v. Przychocki, 7 N.J. 456 (1951). Cf. Harris v. Perl, supra.
Although the judgment is to be reversed for the reasons given above, some of the other grounds of appeal argued by *29 plaintiff present questions which may arise again at the retrial and we will deal with them here to the extent deemed advisable.

V.
Plaintiff has contended that the question of the invalidity of the patent as issued was not properly triable for a number of reasons. First, it is argued that the issue was not comprehended by the pretrial order. However, we agree with defendants' ample showing that the issue was actually tried with plaintiff's acquiescence and without timely objection. R.R. 4:15-2. Miscellaneous other grounds for the argument have been examined and found without merit. An examination of the whole area of patentability of the invention in any aspect is fundamental to a just resolution of this controversy, as we have already seen, especially, as defendants argue, to the issue of damages, which was specified in the pretrial order. And insofar as plaintiff raises a number of procedural questions peculiar to federal patent practice and procedure in relation to patentability, we find them not applicable or controlling in this collateral state-court inquiry. From the adjective standpoint, we are bound only by our own rules of practice and procedure. We do recognize that we are bound by federal substantive law as to patentability, and have so indicated above.
It seems desirable that in view of the outcome of this appeal and the contents of this opinion the case should be pretried anew before the retrial.

VI.
One set of plaintiff's objections to trial rulings appertains to the law of inventorship in respect of joint work of supervisory and subordinate employees, as here.
First, plaintiff contends that the testimony of Oroshnik on the issue of discovery should have been excluded because unsupported by corroborating evidence, citing Radio Corporation of America v. Philco Corporation, 201 F. Supp. 135, 149 (E.D. Pa. 1961); Harper v. Zimmerman, 41 F.2d *30 261, 265 (D. Del. 1930). However, as defendants point out, those cases involved priority of conception and are inapplicable where, as here, each of two parties alleges that he conceived the basic idea and claims to have disclosed it to the other. In the circumstances, it would have placed an impossible burden upon Oroshnik to have required him to produce a corroborating witness on the question of his conception. That witness would have had to be the plaintiff, for it was to her that he alleges he disclosed the discovery. "The question of invention as between [the parties] is really only one of veracity. * * * The evidence of one witness may be sufficient." C.F. Mueller Co. v. A. Zeregas Sons, 12 F.2d 517, 518 (2 Cir. 1926); Concrete Mixing & Conveying Co. v. R.C. Storrie & Co., 27 F.2d 838, 840 (9 Cir. 1928), affirmed 282 U.S. 175, 51 S.Ct. 95, 75 L.Ed. 278 (1930). Once it is accepted, as was the tenor of defendants' proofs, that plaintiff was under the direction of Oroshnik in making the compound, then, as Kell testified, the entries of experiments in plaintiff's notebooks are corroborative of Oroshnik's claim to discovery.
Plaintiff also contends, in relation to her motion for judgment in respect of the process, that it should have been granted even if there were an open issue as to whether Oroshnik conceived the idea of the compound, since he admitted that he did not tell plaintiff what process to use in developing the compound. This argument, and the citation of Pembroke v. Sulzer, 49 App. D.C. 356, 265 F. 996, 998 (Ct. App. D.C. 1920) and Forgie v. Oil Well Supply Co., 58 F. 871, 876 (3 Cir. 1893), in support thereof, are met by the circumstance that the cited cases dealt with situations where only the result to be accomplished was disclosed to the subordinate. Here Oroshnik testified:
"I assigned to Dr. Misani, therefore, I gave Dr. Misani a specific directive, since we were dropping the urecil project, to utilize whatever of the intermediate that she had accumulated, to condense that with hydrazine to give us the pyrazolones which would theoretically add to our anticonvulsant program."
*31 This was more than simply telling plaintiff what result Oroshnik wanted. But the real issue here implicated is whether there was a jury question as to the existence of any element of novelty over the prior art in plaintiff's working out of the process. We hold defendants' proofs clearly did create such an issue for the jury.
Plaintiff makes a general attack on the portion of the charge dealing with the question of inventorship as arising between a superior and subordinate in an employment relationship. The court's charge on this point consisted to a large extent of a quotation from 69 C.J.S. Patents § 92 a, b, which we find basically supported by the authorities cited therein and need not discuss here. The charge adequately conveyed to the jury the concept that the supervisor can get help from a skilled subordinate in reducing his conception to practice and still be considered the inventor. The charge as given, moreover, was actually more favorable to plaintiff than it need have been. Basically, this was to the effect that where the idea of an invention is disclosed to an employee by the employer (or to a subordinate by a supervisor), there is a presumption that the final product arising from this collaboration is the invention of the employer. 69 C.J.S. Patents § 92 b, pp. 421-422. But in so instructing the jury the court was restricting the applicability of this presumption to the issue as to the good faith of Kell in deciding that Oroshnik was the inventor. Actually, the defendants were entitled to the benefit of the presumption on the factual question of who in reality (not merely in the mind of Kell) was the inventor. See Riehm v. Hambleton, 53 F. Supp. 328 (D. Mass. 1943).
Citing Herrmann v. Otken, 201 F.2d 909, 40 C.C.P.A. 794 (1953), plaintiff argues that there should have been no presumption in favor of Oroshnik in this case because her academic standing was equal to that of Oroshnik. But that decision merely explains that the background and experience of the contending claimants are factors to be taken into consideration in determining which party would be more likely to have conceived the invention. That proposition does not *32 disparage the presumption that arises after it is shown (and believed) that the employer conceived the idea and instructed the employee in its development. Note here also that the trial court specifically charged that there was no presumption if the jury did not believe that Oroshnik conceived the idea.
Plaintiff also argues that there was error in admitting Kell's testimony as to the statements made to him by Oroshnik on the ground that this testimony was hearsay. However, the testimony was not hearsay in the light of the limited use for which the trial court admitted it. The statements were not admitted to prove the truth of the matter asserted in them, i.e., that Oroshnik conceived the idea, but solely in relation to the issue of Kell's good faith in arriving at the conclusion that Oroshnik was the inventor and in perfecting the patent applications. The truth of the statements was irrelevant for that purpose, the only question being whether or not they were made and whether or not Kell relied on them, as affecting the liability of Johnson & Johnson, his employer.
A similar analysis validates the court's instruction with respect to Kell's testimony that he would expect a research chemist to record conception of a novel idea in her notebook. That is what Kell said he expected, and it was one of the factors upon which he based his conclusion that Oroshnik was the inventor. The judge had excluded Kell's statement that the Ortho chemists were under instructions to make such entries, and his charge was consonant with that ruling. The fact of Kell's expectation of an entry was not admitted to show the existence of such instructions to chemists, or that Oroshnik was in actuality the inventor. It went only to the reasonableness of the basis for Kell's conclusion on inventorship.

VII.
Several other matters raised by plaintiff call for comment.
Plaintiff complains of the exclusion by the trial court of a communication to her from a patent examiner in relation *33 to a pending application by plaintiff for a patent on the subject matter of the invention here involved. Disregarding questions as to the hearsay nature of the document, this was not a final action or determination of the agency itself, and, in our judgment, any inferences as to patentability of either the process or the new use based thereon would be most speculative, to say the least. There was no prejudicial error in its exclusion.
Plaintiff also charges error in the denial of her offer of the testimony of an expert witness, who testified on her behalf in the previous litigation between the parties, as to the patentability of the process. The witness was said to be out of the jurisdiction. It suffices to dismiss this objection that the subject matter of the respective actions is not substantially identical. Welch v. County of Essex, 6 N.J. Super. 422 (Cty. Ct. 1949), affirmed 6 N.J. Super. 184 (App. Div. 1950). In fact, it is substantially different.
It is argued that there was error in not instructing the jury to take into consideration certain facets of the evidence in relation to the good faith of the defendants, e.g., Kell's failure to consult with plaintiff on the facts before arriving at the opinion of Oroshnik's inventorship, etc. But the trial court has broad discretion in referring to specific evidence in the course of his charge. There was no prejudicial mistake in exercising such discretion here.
Criticism is voiced by plaintiff of the court's charge in relation to the willfulness, malice, or good faith attendant upon defendants' acts. Basically, subject to the following comments, the charge was in our judgment correct. At one point, however, in relation to the liability of Oroshnik in acting upon the advice of Dr. Kell that he was the inventor, the court stated that "if they conspired together" (i.e., Oroshnik and Kell) "he is certainly responsible for it. If it was reasonable, then he is not." Although we find this language neutralized by the charge as a whole, the reference to conspiracy as an antonym to non-actionable conduct in *34 this context was inappropriate and could have been prejudicial.
Furthermore, the court's use of the term "malice" (or malicious) could have been misleading to the jury. In charging a jury in this area, that term is best limited to the issue of punitive damages, since its ordinary meaning is spite or ill will, concepts not requisites to liability for general damages in relation to this tort. Legally, "malice" in this field of law means "the intentional doing of a wrongful act without justification or excuse." Louis Kamm, Inc. v. Flink, 113 N.J.L. 582, 588 (E. & A. 1934); and see Di Cristofaro v. Laurel Grove Memorial Park, 43 N.J. Super. 244, 255-256 (App. Div. 1957). Therefore, the jury should be told that it would be wrongful for defendants to specify Oroshnik as inventor on the patent if plaintiff was the inventor and if defendants knew or reasonably should have known that fact. Liability must here be premised upon knowledge, actual or reasonably imputable, since inventorship is a mixed question of law and fact, often reasonably debatable, and the requisite to liability, as indicated, is the "intentional doing" of the wrongful act. Good or bad faith were therefore properly charged here by the trial court as criteria of liability for general damages. But malice, as noted, if mentioned at all, should be expressly confined to the issue of punitive damages. (In other respects the charge as to punitive damages below was essentially correct.)
Plaintiff complains that the trial court refused to instruct the jury that statements in an application by Ortho to the Canadian patent authorities for a patent on the process here involved, averring patentability of the process constituted admissions evidential against Ortho. Although the request to charge was not precisely so framed, the general subject matter was covered therein. We think an instruction on the point would have been appropriate, although we would not find reversible error in the omission, taken alone, since the pertinent evidence was admitted.
*35 Patentability, as indicated above, is a mixed question of law and fact. Canadian law on patentability is essentially the same as United States law. See Patent Act. 1935, c. 32, §§ 2(d), 28; see also Commissioner of Patents v. Ciba Ltd., [1959] S.C.R. 378; Metalliflex Ltd. v. Rodi and Wienenberger, [1961] S.C.R. 117. Ortho informed the Canadian authorities that notwithstanding the Beilstein reference the patent claim on the process was "clearly in an allowable condition." So far as that statement involved factual elements, it was an admission by defendants contradictory to their trial position here. See Bauman v. Royal Indem. Co., 36 N.J. 12 (1961); but see Simmons Company v. A. Brandwein & Co., 250 F.2d 440, 451-452 (7 Cir. 1957).

VIII.
Plaintiff's last major contention is the alleged unfair and prejudicial handling of the case as a whole by the trial judge against her and in favor of defendants. Detailed discussion of the items of complaint is unnecessary as there is to be a retrial in any event.
We find no basis whatever for the implication that the trial judge was unfair and biased against plaintiff in his trial conduct. However, his demeanor during the trial may, perhaps, have unconsciously reflected his opinion, frankly expressed at the hearing of the plaintiff's motion for a new trial, that this action was "nothing but a continuation of a process of annoying the defendants because of the irritation of the plaintiff because of her discharge." Notwithstanding that private view, and our disagreement with some of his rulings, we think the trial judge endeavored conscientiously to discharge his duties in this difficult assignment with fairness and in accordance with the law. Much of the difficulty here lay in plaintiff's frequent refusal to accept trial rulings without extended argument, possibly due to her lack of experience in the conduct of a trial and her handicapped position as both attorney pro se and sole witness for her side of the case.
*36 Miscellaneous additional points raised by plaintiff have been examined and found either without merit or inconsequential.
Reversed and remanded for a new trial as to defendants Ortho, Oroshnik, and Johnson & Johnson.
NOTES
[1] "* * * a United States patent is issued in the inventor's name, and although he assigns the rights to his company, his name will forever be attached to that patent. This is his indisputable claim to being an accomplished inventor, and no one  no company  can take this away from him. The more patents that bear his name, regardless of what he did with the rights to them, the greater is his standing in the technological community. Issued patents are tangible evidence of his worth as an inventor, and they are perfectly salable in his quest for a job wherever he goes." (Emphasis by author.) Barnes, "The Patent System From An Inventor's Point of View," 5 Pat., T.M., and Copyright J. 64, 68 (1961).
[2] To illustrate the effect of the 1952 amendment, the court in Rohm & Haas Company, supra, sustained the validity of a 1953 reissue patent claim reading: "The process of controlling fungus growth on living plants which comprises applying to the plant a fungicidal composition having as an active ingredient a salt of an alkylene bisdithiocarbamic acid." The original patent, issued in 1943, was drafted as a claim identical with so much of the 1953 reissue claim as reads beginning with the words "a fungicidal composition," etc. The court indicated that there was some uncertainty as to the validity of the original patent as the composition was previously known, although not used for any practical purpose until the patentee conceived of its use as a fungicide. But the 1952 statutory amendment clearly validated the 1953 reissue patent as a claim for a new use even though of a known composition.
[3] Obviously, technical publications in a foreign language are useless to a jury. They should be submitted in English translation, if introduced as exhibits.
[4] E.g., after arguing that both the compound and process were known before plaintiff's work, one of defense counsel stated in summation: "What are we talking about in the first place. It just seems too clear * * * that there was nothing of credit or value which could have been taken from the plaintiff in this situation." The other counsel said: "You cannot be deprived of credit for something which has no value. Mr. McLean * * * says that Beilstein anticipated this compound * * *. Mr. McLean also said that the addition of the word `anti-convulsant' adds nothing to it, you couldn't get a patent by using the word `anti-convulsant.'" (rather an over-simplification of the nature of a process claim for a new use; see Rohm & Haas Company v. Roberts Chemicals, supra).
[5] It may be noted that the more appropriate emphasis as to plaintiff's claim of damage is that she was deprived of the accretion to her reputation as a chemical inventor which she would presumably have gained by the publication of a patent disclosing her inventions, here asserted to include compound, process, and new use.
[6] The foregoing discussion, incidentally, points up the desirability in such a case as this of requesting a special verdict from the jury on the issue of the identity of the inventor (plaintiff made such a request below).
[7] In respect of which we do not mean to disparage the general right of a court to comment on the testimony. But see Ridgewood v. Sreel Investment Corp., 28 N.J. 121, 128, 129 (1958).