STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT, v.
FRANK ABBOTT, DEFENDANT-APPELLANT.

Argued September 13, 1961—Decided November 6, 1961.

64

66

*Mr. Charles Handler* argued the cause for defendant-appellant (*Mr. Joel F. Handler,* on the brief).

*Mr. Martin L. Greenberg,* Assistant Prosecutor, argued the cause for plaintiff-respondent (*Mr. Brendan T. Byrne,* Essex County Prosecutor, attorney).

The opinion of the court was delivered by

WEINTRAUB, C. J. Frank Abbott was convicted of atrocious assault and battery. The Appellate Division affirmed, 64 *N. J. Super.* 191 (1960), and we granted certification, 34 *N. J.* 176 (1961).

Abbott shared a common driveway with his neighbors, Michael and Mary Scarano. The Scaranos engaged a contractor to pave their portion. Abbott obtained some asphalt from the contractor and made a doorstop to keep his garage door from swinging onto the Scaranos' property. Nicholas Scarano, who was visiting with the Scaranos, his parents, objected to Abbott's innovation. After some words between them a fist fight ensued.

Although Abbott managed to land the first punch, with which he sent Nicholas to the ground, a jury could find Nicholas was the aggressor. At this point Michael Scarano came at Abbott with a hatchet. Michael said the tool had just been returned to him by the contractor, and denied he

meant to use it as a weapon. According to Abbott, Mary Scarano followed, armed with a carving knife and large fork. The actors gave varying versions of what happened, but the end result was that all of the Scaranos were hit by the hatchet. Nicholas received severe head injuries. Abbott claimed he too suffered a laceration.

Abbott admitted he finally wrested the hatchet from Michael but denied he wielded it at all. Rather he insisted that the Scaranos were injured during a common struggle for the instrument. A jury could, however, find Abbott intentionally inflicted the blows.

Abbott was separately indicted for atrocious assault and battery upon each of the Scaranos. There was a common trial of these indictments. The jury acquitted Abbott of the charges relating to Michael and Mary, but found him guilty as to Nicholas.

## I.

The principal question is whether the trial court properly instructed the jury upon the issue of self-defense. The trial court charged upon the subject of excessive force, as to which Abbott does not complain. It charged also upon the subject of retreat, and it is here that error is alleged. Although the jury could have found Abbott used excessive force, we cannot know whether the jury found for him on that subject and convicted because he had failed to retreat in accordance with the trial court's instruction.

As to retreat, the trial court charged upon two hypotheses. One was that the critical events occurred upon Abbott's property. Upon that basis, the court said Abbott could stand his ground, and, of course, of this Abbott does not complain. The second hypothesis was that the alleged offense occurred upon the common driveway. Presumably on the authority of *State v. Pontery,* 19 *N. J.* 457, 475 (1955), the trial court held that since all the principals were equally entitled to be on the driveway, Abbott could not claim im-

munity from the ordinary retreat rule. Abbott does not question that thesis, but disputes the court's statement of the conditions under which an obligation to retreat would arise.

## A.

( ██ We have the preliminary question whether defendant must demonstrate "plain error" to question the instruction. As the Appellate Division noted, defendant did not record a protest to the charge as given. But he had requested a charge and did note his objection to the trial court's refusal to grant it. His request was erroneous, but nonetheless it is plain he did not acquiesce in the trial court's version. The important fact is that the trial court was alerted to the basic problem and charged in a manner different from the request made. In such circumstances, especially when the controlling principles are complex or unsettled, it would be unreasonable to deny a review merely because a defendant failed to project a formula which squares with our concept of the true doctrine. We would never deny relief merely because a litigant's position on appeal went beyond the point we found to be correct. We should not demand a greater capacity for prediction during the trial itself. We accordingly reach the meritorious issue.

## B.

( The subject of retreat usually arises in homicide matters. We will first discuss it in that context, and then consider whether the principles apply to a charge of atrocious assault and battery, and if they do, whether the trial court correctly guided the jury in this difficult area.

We should make it clear that we are discussing the doctrine of retreat and not the subject of the use of excessive force. If the force used was unnecessary in its intensity, the claim of self-defense may fall for that reason. In the discussion which follows we assume a defendant used no more force

than he believed necessary to protect himself in the circumstances as they reasonably appeared to him, and consider only whether the claim of self-defense should be denied because he could have avoided the use of that force by retreating.

The question whether one who is neither the aggressor nor a party to a mutual combat must retreat has divided the authorities. Self-defense is measured against necessity. *Brown v. State,* 62 *N. J. L.* 666, 708 (*E. & A.*), affirmed, 175 *U. S.* 172, 20 *S. Ct.* 77, 44 *L. Ed.* 119 (1899); *State v. Hipplewith,* 33 *N. J.* 300, 316–318 (1960). From that premise one could readily say there was no necessity to kill in self-defense if the use of deadly force could have been avoided by retreat. The critics of the retreat rule do not quarrel with the theoretical validity of this conclusion, but rather condemn it as unrealistic. The law of course should not denounce conduct as criminal when it accords with the behavior of reasonable men. Upon this level, the advocates of no-retreat say the manly thing is to hold one's ground, and hence society should not demand what smacks of cowardice. Adherents of the retreat rule reply it is better that the assailed shall retreat than that the life of another be needlessly spent. They add that not only do right-thinking men agree, but further a rule so requiring may well induce others to adhere to that worthy standard of behavior. There is much dispute as to which view commands the support of ancient precedents, a question we think it would be profitless to explore.

Other jurisdictions are closely divided upon the retreat doctrine. It is said that the preponderant view rejects it. *Perkins, Criminal Law* 899 (1957); 1 *Warren, Homicide* § 157, at *pp.* 767–68 (*perm. ed.* 1938); *Model Penal Code* § 3.04, comment 3, at *p.* 24 (*Tent. Draft No.* 8, 1958). For additional discussions of the contending views see 1 *Wharton, Criminal Law and Procedure* § 235 (*Anderson* 1957); Annotation, 2 *L. R. A.* (*N. S.*) 49 (1906); Annotation, 18 *A. L. R.* 1279 (1922). Our Court of Errors and

Appeals deliberately adopted the retreat rule with an aware-
ness of the contending views, *State v. Di Maria,* 88 *N. J. L.*
416 (*Sup. Ct.* 1916), affirmed o. b., 90 *N. J. L.* 341 (*E. & A.*
1917), and the doctrine has since been invoked. *State v.
Centalonza,* 18 *N. J. Super.* 154 (*App. Div.* 1952); *cf.
State v. Goldberg,* 12 *N. J. Super.* 293 (*App. Div.* 1951).
The *Model Penal Code* embraces the retreat rule while
acknowledging that on numerical balance a majority of the
precedents oppose it. *Model Penal Code* § 3.04, comment 3,
at *p.* 24 (*Tent. Draft No.* 8, 1958).

We are not persuaded to depart from the principle of
retreat. We think it salutary if reasonably limited. Much
of the criticism goes not to its inherent validity but rather
to unwarranted applications of the rule. For example, it
is correctly observed that one can hardly retreat from a
rifle shot at close range. But if the weapon were a knife,
a lead of a city block might well be enough. Again, the
rule cannot be stated baldly, with indifference to the excite-
ment of the occasion. As Mr. Justice Holmes cryptically
put it, "Detached reflection cannot be demanded in the
presence of an uplifted knife." *Brown v. United States,*
256 *U. S.* 335, 343, 41 *S. Ct.* 501, 65 *L. Ed.* 961, 963
(1921). Such considerations, however, do not demand that
a man should have the absolute right to stand his ground
and kill in any and all situations. Rather they call for a
fair and guarded statement of appropriate principles.

In *Brown, supra,* the United States Supreme Court said
(256 *U. S.,* at *p.* 343, 41 *S. Ct.,* at *p.* 502, 65 *L. Ed.,* at
*p.* 963):

"* * * Rationally the failure to retreat is a circumstance to
be considered with all the others in order to determine whether the
defendant went farther than he was justified in doing; not a cate-
gorical proof of guilt."

The comment to § 3.04 of the *Model Penal Code* (at *p.* 24)
says the passage just quoted "seems to be a median position"
and "would apparently remit the issue to the jury, without

a legal mandate on the point." We are not sure we correctly understand these observations. We think it clear that *Brown* accepted the retreat doctrine, but we do not read the opinion of Mr. Justice Holmes to mean that the subject should be submitted without guidance, thus permitting each jury to decide whether the subject of retreat should be considered, and if so, what the ingredients of the doctrine should be. We know of no jurisdiction which leaves to a jury the task of devising the legal principles. Rather we read *Brown* to hold only that the particular "formula laid down by the [trial] court" was not "adequate to the protection of the defendant's rights" (256 *U. S.*, at *pp.* 342–343, 41 *S. Ct.*, at *p.* 502, 65 *L. Ed.*, at *pp.* 962–63) in the factual pattern which the defendant there asserted.

We believe the following principles are sound:

■ 1. The issue of retreat arises only if the defendant resorted to a deadly force. It is deadly force which is not justifiable when an opportunity to retreat is at hand. *Model Penal Code* § 3.04(2)(b)(iii). As defined in § 3.12(2) a deadly force means "force which the actor uses with the purpose of causing or which he knows to create a substantial risk of causing death or serious bodily harm."

■ Hence it is not the nature of the force defended against which raises the issue of retreat, but rather the nature of the force which the accused employed in his defense. If he does not resort to a deadly force, one who is assailed may hold his ground whether the attack upon him be of a deadly or some lesser character. Although it might be argued that a safe retreat should be taken if thereby the use of *any* force could be avoided, yet, as the comment in the *Model Penal Code* observes (at *p.* 23), "The logic of this position never has been accepted when moderate force is used in self-defense; here all agree that the actor may stand his ground and estimate necessity upon that basis." *Cf. Prosser, Torts* §19, at *p.* 90 (2d ed. 1955) ; *Restatement, Torts* § 63 (1934). Hence, in a case like the present one, the jury should be instructed that Abbott could hold his ground when Nicholas

came at him with his fists, and also when Michael and Mary came at him with the several instruments mentioned, and that the question of retreat could arise only if Abbott intended to use a deadly force.

■ 2. What constitutes an opportunity to retreat which will defeat the right of self-defense? As § 3.04(2)(b)(iii) of the *Model Penal Code* states, deadly force is not justifiable "if the actor *knows* that he can avoid the necessity of using such force *with complete safety* by retreating \* \* \*." We emphasize "knows" and "with complete safety." One who is wrongfully attacked need not risk injury by retreating, even though he could escape with something less than serious bodily injury. It would be unreal to require nice calculations as to the amount of hurt, or to ask him to endure any at all. And the issue is not whether in retrospect it can be found the defendant could have retreated unharmed. Rather the question is whether he knew the opportunity was there, and of course in that inquiry the total circumstances including the attendant excitement must be considered. We add that upon a retrial the facts as developed in the light of this principle may be such that Abbott would be entitled to an instruction that if his version of the approach by Michael and Mary is accepted, the issue of retreat must be resolved in Abbott's favor.

■■ 3. There has been some uncertainty in the language of our cases upon the burden of proof with respect to self-defense. The decisions are treated in *State v. Chiarello,* 69 *N. J. Super.* 479 (1961), where the Appellate Division correctly said that although the burden is upon a defendant to adduce evidence to support the defense, yet if such evidence appears either in the State's case or upon the defendant's case, the issue must be left to the jury with this instruction: that the burden is upon the State to prove beyond a reasonable doubt that the defense is untrue, and hence there must be an acquittal if there is a reasonable doubt as to whether defendant did act in self-defense within the definition of that defense. Accordingly, if the issue of

retreat is raised in connection with the defense of self-defense, the jury should be instructed that the burden is also the State's to prove beyond a reasonable doubt that defendant knew he could have retreated with complete safety, and that if a reasonable doubt upon that question should exist, the issue of retreat must be resolved in defendant's favor.

## C.

As we have said, the subject of retreat arises most often in homicide cases. It is equally pertinent if the charge is assault with intent to kill (*N. J. S.* 2A:90–2). *State v. Centalonza, supra* (18 *N. J. Super.* 154). Here the charge is atrocious assault and battery (*N. J. S.* 2A:90–1), a crime which involves vicious or brutal conduct. *State v. Riley,* 28 *N. J.* 188, 197–198 (1958), appeal dismissed and *cert.* denied, 359 *U. S.* 313, 79 *S. Ct.* 891, 3 *L. Ed. 2d* 832 (1959). An intent to kill is not an ingredient of that offense, but an intent to do serious bodily harm would seem to be implicit. The doctrine of retreat reflects a policy with respect to the use of deadly force, and the same policy considerations equally obtain if the end result is something less than murder. The Appellate Division held the doctrine applicable to atrocious assault and battery. The comment to Article 3 of the *Model Penal Code* (at *p.* 3) expresses the same view, saying, "If the particular force, for example, would be unjustifiable in a prosecution for homicide it should be equally unjustifiable if the victim survives and what is charged is an assault." This seems sound, and hence an instruction upon the subject is appropriate in a trial for atrocious assault and battery, but the instruction should be expressly centered about the use of deadly force.

## D.

We turn to the instruction of the trial court. It reads:

"* * * If you find the charges involved or either of them happened on the joint or common driveway and that the defendant

had an available opportunity to retreat and you also find that he was or appeared to be threatened by assault and battery with imminent danger of life or serious bodily harm, again there is no duty to retreat. On the other hand, under the latter circumstances, if you find that he did not appear to be threatened by assault and battery with imminent danger of life or great bodily harm, he had a duty to retreat and if he failed to retreat the defense of self-defense would not avail him and would not constitute a defense to these charges or any of these charges if you find that he had a duty to retreat."

It is at once apparent that the charge consists of abstract propositions, unanchored to the factual setting. It will be recalled the encounter had two phases, although one quickly followed the other. The first phase was an unarmed attack by Nicholas which Abbott met in kind; the second involved, as the jury could find, an attack or apparent attack by hatchet in the hands of Michael and by kitchen utensils allegedly wielded by Mary, both aided by Nicholas who had arisen from the initial punch. We have no way of knowing whether the jury understood Abbott was required to retreat when first assailed by Nicholas alone. The jury may well have so gathered since the instruction excluded self-defense "if you find that he [Abbott] did *not* appear to be threatened by assault and battery with imminent danger of life or great bodily harm," and of course Nicholas's attack with his fists readily fitted within those terms.

The State asks us to assume the jury understood an unarticulated premise, *i. e.,* that the court was referring solely to the hatchet affair. If we could so assume, still under the instruction the obligation to retreat would depend upon the nature of the attack upon Abbott rather than the amount of force Abbott intended to employ. In short, there was no reference to the use of a deadly force by Abbott. And if we should read the charge in still another way, to wit, that the court was merely defining its prior reference to "an available opportunity" to retreat and hence meant that the opportunity was not "available" if retreat would have subjected Abbott to imminent danger to his life or of great bodily harm but was "available" if he could get away with

a hurt of lesser character, still the charge would be incorrect. This is so because there is no obligation to retreat unless retreat can be effected "with complete safety," and indeed with knowledge that retreat can be so effected. Further, upon that interpretation, the instruction would be devoid of any statement of the facts prerequisite for consideration of the subject, *i. e.*, an intent by the defendant to use a deadly force.

We have said enough to indicate the insufficiency of the charge. Even upon study and restudy we are not sure we can extract the thesis the trial court held. A jury which listens to a single reading of an instruction cannot be expected to debate its meaning and reach a correct view of it. A charge should be a clear, unambiguous guide related to the evidence in the case. The conviction must be reversed.

## II.

The record of Abbott's direct examination reads in part:

"Q. How much do you weigh, Mr. Abbott? A. At the present time? Q. At the present time. A. Just close to 200 pounds, right now.

Q. Now, on July 15, 1957 [the date of the alleged crime] do you know how much you weighed? About July 15, not necessarily on that day, say within a few pounds either way. A. About 135, 140 pounds, I guess.

Q. Why was your weight so low at that time?

Mr. Loftus: I object on the ground it is irrelevant. I don't see any relevancy to this situation.

The Court: I will sustain the objection."

Defendant complains he was thereby barred from showing serious medical conditions, pertinent to his ability to defend with lesser force or to retreat with safety. The Appellate Division held defendant failed to comply with *R. R.* 1 :5–1(a) in that he did not object to the ruling, and further held there was no manifest wrong or injury.

The cited rule reads in part:

"* * * Error in the admission or rejection of testimony, or in the charge of the court, or in the refusal to charge as requested by

the defendant, or in the denial by the court of any matter resting in discretion, or in any other ruling or order made during the course of the trial, shall be cause for reversal *if specific objection thereto was made* and it appears from the entire record of the proceedings had upon the trial that the defendant thereby suffered manifest wrong or injury." (Emphasis added)

Read literally, this rule would seem to require a specific objection to be stated after an offer of proof has been rejected, and some casual statements might be read to support that theme. *State v. Gibson*, 15 *N. J.* 384, 391 (1954); *State v. Huff*, 14 *N. J.* 240, 248 (1954); *State v. Hogan*, 20 *N. J. Super.* 1, 9 (*App. Div.* 1952). Thus understood, the rule could be thought to continue the discredited practice of former days under which error could not be asserted on appeal unless at the trial counsel had intoned "exception."

█ Our rules do not perpetuate mere ritual. Rather the purpose is to require a litigant to make known his position to the end that the trial court may consciously rule upon it. When that has happened, it would be pure ceremony to require some further protest. This view is embodied in *R. R.* 3:7–8, which reads as follows and in the light of which *R. R.* 1:5–1(a), quoted above, must be understood:

"Exceptions to rulings or orders of the court or instructions to the jury are not required in order to reserve the questions involved for review on appeal; and for all purposes for which an exception has heretofore been necessary it suffices that the defendant, at the time the ruling or order of the court is made or sought, makes known to the court the action which he desires the court to take or his objection to the action of the court and the grounds therefor; but if a party has no opportunity to object to a ruling or order, the absence of an objection shall not thereafter prejudice him."

Actually in the Tentative Draft (1948) of our rules, the provisions of this rule appeared in *Rule* 1:2–14(a), the forerunner of *R. R.* 1:5–1(a).

█ Applied to the admission and exclusion of evidence, these rules have this effect: If a litigant complains of the *admission* of evidence, he must show he objected to its receipt and stated the reasons for his opposition. If he did, no more is required to preserve his right to appellate

review. If the litigant complains of an *exclusion* of evidence, it is enough that his adversary's objection was upheld unless he refused an opportunity to tell the court why he thought the evidence should be admitted. Here Abbott complains of the exclusion of proof. The State objected to the offer as "irrelevant." If the trial court wished Abbott to explain his thesis, an opportunity to do so should have been given. The trial court did not, but rather, apparently satisfied it fully appreciated what was involved, upheld the State. We see no reason to require Abbott to utter "I object" or to attempt to argue against a ruling already announced. He made known the ruling he wished, *i. e.*, admission of the evidence he offered. He did not decline an opportunity to enlighten the court. We are satisfied the alleged error is presented without recourse to the doctrine of "plain error."

There is a different question with which the one just discussed should not be confused. That question is whether a litigant must spread on the record the essence of what he would have proved but for the adverse ruling. *R. R.* 4:44–3 provides "the examining attorney may make a specific offer of what he expects to prove by the answer of the witness." The rule in terms applies to civil matters but is merely declaratory of prior good practice and should be observed as well in criminal proceedings. Without such disclosure, an appellate court cannot readily evaluate whether the exclusion, although erroneous, resulted in manifest wrong or injury. *State v. Micci,* 46 *N. J. Super.* 454, 458 (*App. Div.* 1957); see *State v. Gambutti,* 36 *N. J. Super.* 219, 233 (*App. Div.* 1955); *New Jersey Highway Authority v. Rudd,* 36 *N. J. Super.* 1, 5 (*App. Div.* 1955).

Of course the details of the proffered proof ultimately depend upon the integrity of counsel, and that being so, a representation first made on appeal might be argued to be no less meaningful. But the proffer should be made at trial, for at least the reason that the statement may well induce the trial judge to reconsider and perhaps to reverse his ruling.

 Our experience indicates widespread failure to place such offers upon the trial record. Indeed, frequently we receive our first glimpse in response to questions at oral argument. In the present case the disclosure first appeared in the brief on appeal, wherein we are told defendant wanted to prove serious injuries and illness from which he was in the process of recovery at the time of the alleged offense. The admissibility of such proof on the issues of excessive force and of retreat is too evident to require discussion. The question disallowed was on its face suggestive of proof of that kind. Since the judgment must be reversed for other reasons already given, we need not speak further of the sufficiency of the record. But we take this opportunity to remind the bar that a failure to spread the offer on the trial record may lead the appellate court to conclude that it cannot find the error was harmful.

## III.

 Abbott further urges the State could not move the indictment against him because prior thereto it had brought Michael Scarano to trial for assault with intent to kill him, which trial resulted in an acquittal. We think the Appellate Division correctly rejected this contention.

## IV.

Since the case must be remanded, we refer to a ruling of which Abbott does not here complain, lest it be repeated at a retrial. During direct examination Abbott was asked, "At any time did you intentionally strike anybody with this ax?" The State objected "on the ground it is leading," and was sustained. Curiously, a question essentially the same had already been asked and answered. After that question was answered, the State objected without specifying any ground. The trial court replied, "I think it is admissible and is answered anyway. I will permit it to stand."

 The objection that the question was "leading" was unsound. In a sense every question is "leading." If

interrogation did not lead, a trial would get nowhere. Indeed one vice of a question such as, "What is your position in this case?," is that it does not lead enough, and thus would deny the opposing party an opportunity to guard against the rankest kind of improper proof. A question must invite the witness's attention to something. No formula can be stated with confidence that it will embrace all situations. But it may be said that ordinarily a question is not improperly leading unless it suggests what the answer should be or contains facts which in the circumstances can and should originate with the witness. See generally *McCormick, Evidence* § 6 (1954); 3 *Wigmore, Evidence* §§ 769–72 (*3d ed.* 1940). The question whether Abbott intentionally struck any of the Scaranos with the ax was perfectly proper; we do not see how else it could be phrased. *Cf. State v. Len,* 108 *N. J. L.* 439, 440 (*Sup. Ct.* 1932).

Since the objection to the earlier question was not particularized, it is appropriate to add that questions addressed to the mental operations of a defendant are thoroughly proper when such operations are an ingredient of the State's case or of a defense. See *State v. Myers,* 7 *N. J.* 465, 483 (1951); *State v. Len, supra* (108 *N. J. L.* 439). Relevancy and materiality are obvious. And a defendant's competency to testify thereto is equally plain. Indeed no one knows better than he. Of course, he may not be believed, but his self-interest is not a bar, and has not been since the demise of the common-law rule which denied the stand to a party to a controversy. See 2 *Wigmore, Evidence* § 579, at *p.* 701 (*3d ed.* 1940).

The judgment is reversed and the matter remanded for further proceedings not inconsistent herewith.

*For affirmance*—None.