**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court."
Although it is posted on the internet, this opinion is binding only on the
parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-4079-15T4

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

PEDRO A. GARCIA,

    Defendant-Appellant.

_____

Submitted December 20, 2017 — Decided July 11, 2018

Before Judges Nugent and Currier.

On appeal from Superior Court of New Jersey,
Law Division, Bergen County, Indictment No.
11-11-1892.

Joseph E. Krakora, Public Defender, attorney for
appellant (Michele A. Adubato, Designated Counsel, on
the brief).

Christopher S. Porrino, Attorney General, attorney for
respondent (Arielle E. Katz, Deputy Attorney General,
of counsel and on the brief).

PER CURIAM

    Defendant, Pedro A. Garcia, confessed to police that he and

a co-defendant, Wilfredo Sanchez, stabbed to death, decapitated,

dismembered, and dispersed the body parts of the gay man with whom

they lived. For those offenses, a jury convicted defendant of murder, desecrating human remains, and other crimes, and a judge sentenced him to an aggregate sixty-year prison term with forty-two and one-half years parole ineligibility.[1]

Defendant appeals. He argues he did not voluntarily, knowingly, and intelligently waive his Miranda[2] rights before confessing to police, and thus the trial court erred by denying his suppression motion. He also argues that separately or cumulatively, the improper and prejudicial testimony of three witnesses, the admission of gruesome photographs, the prosecutor's misconduct, and the trial court's refusal to charge the jury on manslaughter, deprived him of a fair trial. Last, he argues his sentence is excessive.

We reject defendant's arguments. The motion record amply supports the trial court's finding that defendant voluntarily, knowingly, and intelligently waived his Miranda rights and confessed his crimes. With the exception of his request for a jury instruction on manslaughter, defendant preserved for

_____

[1] In a separate trial, a jury convicted co-defendant Sanchez on all counts and a judge sentenced him to an aggregate term of life imprisonment plus fifteen years. His conviction was affirmed. State v. Sanchez, No. A-5951-13 (App. Div. Aug. 19, 2016), certif. denied, 230 N.J. 602 (2017).

[2] Miranda v. Arizona, 384 U.S. 436, (1966).

appellate review none of the alleged trial errors he now complains of, and none were clearly capable of producing an unjust result. And defendant's sentence is neither illegal nor conscience shocking. For these reasons, we affirm defendant's convictions and sentence.

I.

A.

A Bergen County Grand Jury charged co-defendants in a multi-count indictment with first-degree murder, N.J.S.A. 2C:2-6 and N.J.S.A. 2C:11-3(a)(1) & (2); second-degree desecration of human remains, N.J.S.A. 2C:2-6 and N.J.S.A. 2C:22-1(a); second-degree disturbing or concealing human remains, N.J.S.A. 2C:2-6 and 2C:22-1(a); two counts of third-degree possession of a knife for an unlawful purpose, N.J.S.A. 2C:2-6 and N.J.S.A. 2C:39-4(d); two counts of fourth-degree unlawful possession of a knife, N.J.S.A. 2C:39-5(d); and two counts of third-degree hindering apprehension, N.J.S.A. 2C:29-3b(1) and N.J.S.A. 2C:29-3(b)(4). (Da1-4). Following the indictment, defendant filed a motion to suppress statements he made to police. The court denied the motion. At trial, the jury found defendant guilty on all counts.

The trial court sentenced defendant as follows: For murder, to a fifty-year prison term subject to the No Early Release Act, N.J.S.A. 2C:43-7.2; for desecrating the victim's body, to a ten-

3

year prison term consecutive to the murder count; and for disturbing or concealing human remains, to a ten-year prison term concurrent to the other counts. The court merged the weapons offenses. On the two hindering apprehension counts, the court sentenced defendant on each to a five-year prison term concurrent to all other counts. Defendant appeals.

B.

The State presented the following proofs at trial. The victim, a single gay man, lived in a three-room studio apartment, one of three in a building on Palisade Avenue in Cliffside Park. During December 2010 and January 2011, defendant also resided in the apartment. In the latter part of December 2010, while the victim spent time in El Salvador, defendant invited co-defendant, Wilfredo Sanchez, to move into the apartment, which Sanchez did. Defendant and Sanchez were still living there when the victim returned near the month's end.

According to the victim's sister, the victim and defendant enjoyed a sexual relationship, but defendant would often deny it. The sister once observed defendant become angry because the victim had told defendant's ex-wife defendant was gay. When asked by the prosecutor what the victim said about the relationship with defendant, the sister testified — without objection from defendant

A-4079-15T4

— "when my brother would give him money, everything was fine. But when my brother wouldn't give him anything he would abuse."

Similarly, another tenant in the three-unit building testified the victim said he loved defendant a lot, but defendant did not love him. The other tenant once found the victim crying, and the victim said defendant had hit him. According to the other tenant, "[the victim] said that [defendant] had told him that he was going to kill him. [The victim] took it . . . as if it were a joke." A third tenant testified the victim always said he was deeply in love with defendant, but defendant would become embarrassed when the victim referred to defendant as a boyfriend. The third tenant once observed defendant slap the victim.

During the second Sunday, Monday, and Tuesday of January 2011, police investigated the victim's disappearance and homicide. They became involved when the victim's sister reported him missing. When he did not answer her daily call on Sunday, and she later learned he missed work — which he had never done — she went to his apartment where she confronted Sanchez, his brother, and a friend. Sanchez phoned defendant, who came to the apartment a short time later. Disbelieving defendant when he denied knowing where the victim was, the victim's sister said she had installed cameras in the apartment during her brother's trip to El Salvador. When she made this statement, she observed defendant become nervous.

The victim's brother arrived and called police. Patrol officers arrived shortly after 6:30 p.m., but they did not speak Spanish and the apartment's occupants did, so defendant and the victim's siblings went to Cliffside Park Police Station where they were interviewed by an officer who spoke Spanish. His name was Jesus Garcia. The victim's sister told Officer Garcia she was very concerned about her brother and the last person to see him was defendant. She insisted defendant knew what happened to her brother. Defendant denied this.

Defendant told Officer Garcia he had come home from work the previous evening, Saturday, and was very tired. There was a party going on in the apartment, but he went to sleep. Later, the victim left with unknown persons. According to defendant, the victim frequented gay clubs in New York City and that is probably where he had gone. Officer Garcia helped the victim's siblings file a missing person report.

While Officer Garcia was assisting the victim's siblings, the victim's upstairs neighbor telephoned and said she had seen what appeared to be blood stains on the walls, in the kitchen, and in the bathroom of the victim's apartment. Officer Garcia was dispatched to the apartment, which was only a minute or two from the police department.

Sanchez, his brother, and his friend were still there. Sanchez told Officer Garcia he and his brother had attended the party the previous night but left at 12:30 a.m. The officer observed blood in three places: the wall beneath a mirror in the living room, on a kitchen cabinet, and in the bathroom.

The victim's sister and defendant returned at approximately 9:45 p.m. The officer overheard the victim's sister and defendant arguing. She insisted a set of bed sheets was missing. He said they had been thrown out due to a bug problem. She insisted defendant permit her to look through the victim's knife drawer and that the police also look through it. According to the officer, "[t]here was no answer from [defendant] at that time about the knives." Defendant did not object to this testimony.

Officer Garcia asked defendant if he knew where the blood came from. Defendant said he was asleep the night before and did not know who was at the party, but around ten o'clock somebody knocked on the apartment door. When the victim answered the door, the person punched him in the face. The victim shut the door and continued to party. Defendant could not identify the assailant.

A short time later, Cliffside Park Detective Sergeant John MacKay arrived. Defendant and the victim's sister continued to argue about the bed sheets. Officer Garcia testified the sister continued to insist she be allowed to look in the knife drawer.

Officer Garcia also heard defendant tell the victim's sister, "[y]our brother had too much trust in Wilfredo." According to Officer Garcia, defendant spoke in the past tense then corrected himself and spoke in the present tense.

Officer Garcia and Detective MacKay asked everyone except defendant to leave the apartment. Detective MacKay interviewed defendant and Officer Garcia translated. Defendant again denied he was gay and then repeated to Detective MacKay what he had told Officer Garcia about the party the previous night and the victim leaving at approximately 2:00 a.m.

The next day, Monday, the investigation evolved into a homicide investigation. That morning, detectives observed evidence of blood in the parking lot behind the victim's apartment building. They summoned a K-9 officer with a cadaver dog named Harley. Harley gave a "positive indication" by licking and scratching at the blood spot. The dog was trained to "indicate" on human remains only. During the day, the K-9 officer and Harley conducted a "spiral search" from the parking lot. Harley gave positive indications at three locations not far from the victim's apartment. The dog first located a large black garbage bag in a "Christmas wrapped box" behind a church and three more black garbage bags at a construction site. Harley exhibited behavior at a third site that indicated he smelled human remains, but he

did not give a positive indication, that is, lick or scratch any container.

The garbage bag found at the church and two of the garbage bags found at the construction site contained human remains. One contained a severed head. Another contained a torso. The third contained a right lower human leg with a blue sock on it. The bags also contained two knives, a knife sharpener, assorted clothing, latex gloves, cigarette butts, a shower curtain, a bath rug, toilet bowl cleaner, a brush, a holder, air freshener, and other items. Many of the items were bloodstained. The victim's sister and brother identified the severed head found inside one of the garbage bags as that of the victim. The victim's arms, left leg, and penis were not recovered. During the trial, the prosecution introduced without objection various photographs of the garbage bags' contents.

Following the gruesome discoveries, homicide detectives searched the victim's apartment and an apartment where Sanchez had gone to live; the victim's after obtaining a warrant, Sanchez's after obtaining his consent. The detectives seized from the victim's apartment, among other evidence they circumstantially linked to items in the garbage bags, a broken piece of a dinner plate. The plate's pattern matched precisely the pattern on dinner plates, one whole and one broken, contained in the garbage bags.

A-4079-15T4

Similarly, detectives seized from Sanchez's apartment clothing detectives circumstantially matched to clothing removed from the garbage bags. For example, they recovered socks with the same American flag logo as those found in the garbage bags. They also found shirts with sleeves cut off and blue jeans speckled with paint. A shirt with sleeves cut off and a paint-speckled pair of pants were also found in one of the garbage bags.

Detectives also obtained video surveillance footage from cameras near the victim's apartment, near the church, and near the construction site. Surveillance footage captured groups of people crossing a street from the vicinity of the victim's apartment between 1:00 and 1:15 on Sunday morning. According to a detective, they were the people who had attended the party.

Between 4:00 and 5:00 a.m. the same morning, video surveillance captured a person detectives believed to be Sanchez. The man had his hands up around his shoulders as he stepped into the parking-lot area and walked toward the back of the church where Harley found the first bag. Another camera captured the man returning from the area of the church, his hands at his side. The person turned into the driveway of the victim's apartment.

Later Sunday morning, at approximately 8:03 a.m., a video camera on a commercial building across the street from the victim's apartment captured defendant carrying two bags. Defendant placed

10

one on the ground, left the view of the camera, returned approximately eight minutes later, picked up the second bag, and walked past the camera out of its view.

Detectives also obtained video surveillance from the vicinity where Harley had engaged in behavior indicating he had detected a scent of human remains. The surveillance film captured a male, who could not be identified, entering and leaving the area. Detectives learned that residential garbage was collected from this site by public-works trucks on Monday morning, before Harley discovered the victim's remains.

The police picked up Sanchez and arrested him. On Tuesday, the day after the body parts were found, detectives located defendant and transported him to the Bergen County Prosecutor's Office. After providing defendant with food and a bottle of water, and after defendant used a bathroom, detectives informed him of his <u>Miranda</u> rights, which he waived. The detectives videotaped an interview with him. Detective James Brazofsky began the interview at approximately 3:00 p.m. Defendant first repeated the version of events he had given police the previous Sunday evening concerning the victim leaving late Saturday night or early Sunday morning. Defendant then said that on Sunday morning he went to work at a Greek restaurant in Glen Rock where he worked as a cook. Detective Brazofsky testified:

11

> I right off the bat knew he was not being truthful with us because I had been to the Greek [restaurant] the day before and spoken to his boss who informed me that he was fired two weeks earlier so I knew he was not being truthful when he told me he had gone to work Sunday. He did receive his pay from the week or the weeks that he worked prior to being fired but he was fired by that owner two weeks before this homicide took place.

Defendant next told the police, contrary to what he had previously told them, that he and co-defendant cleaned the apartment in the middle of the night and made multiple trips to the street to deposit garbage. When confronted with the surveillance footage, defendant asked whether there were cameras in the victim's apartment. Eventually, after being confronted with multiple inconsistencies, defendant said he would tell the truth.

Defendant confessed. He said, "We did it. It wasn't just me. It was [m]e and [Sanchez]. We did it. We killed him." Defendant admitted that after others left the party, he, Sanchez, and the victim were lying on one bed in the apartment. The victim touched Sanchez and began undoing Sanchez's belt. Sanchez woke up, got angry, shoved the victim to the floor, and punched him at least once. During the scuffle, either Sanchez or the victim broke a dinner plate.

Sanchez yelled he was not defendant, and the victim should not touch him. Defendant attempted to calm Sanchez down, but Sanchez said, "we have to kill him. We have to finish him." In response, defendant went to the kitchen, grabbed a knife, returned, and stabbed the victim once in the neck, inflicting the wound the medical examiner said was the cause of death.

Defendant explained how he and Sanchez stabbed the victim and put him in the bathtub. They ignored the victim's pleas for his life. They disemboweled the victim and watched him die. After the victim died, defendant and Sanchez placed his body on a blanket and carried the body to the apartment's parking lot. They intended to dispose of the body, but it was too heavy to carry further, so they took it back to the apartment and placed it in the bathtub, where they dismembered it.

Defendant admitted they put on gloves to protect their hands. They attempted to hide evidence, including the gloves, pillows, curtains, and a bathroom rug, by placing it in the same bags as the body parts. When they finished putting the victim's body parts and the other items into garbage bags, they used a Clorox bottle to clean the bathroom.

Defendant admitted Sanchez disposed of one bag at a nearby church, and he and Sanchez disposed of other bags at the construction site. Defendant also disposed of a garbage bag where

A-4079-15T4

Harley had detected the odor of blood or remains but found nothing. Defendant did not dispose of the shoes he wore. He was wearing them at the time of the interview. Detectives observed blood on them. Forensic experts matched the blood to that of the victim.

The State produced forensic evidence that corroborated defendant's confession. DNA found on cigarette butts in the black garbage bags matched defendant's DNA. Forensic experts matched DNA from a sock found in a garbage bag to Sanchez's DNA. In addition, as previously explained, items in the black garbage bags matched items seized in the search of the victim's and Sanchez's apartments.

The victim's upstairs tenant testified that after most people left the party at the victim's apartment on Saturday night or early Sunday morning, the victim, defendant, and Sanchez argued. The tenant heard the victim scream repeatedly at defendant to leave the apartment. The tenant heard swearing and cursing. The music coming from the victim's apartment became louder.

According to the tenant, the victim's voice suddenly became muffled and there was much banging coming from the apartment, as though furniture was being moved around. The tenant heard mumbling, then heard the shower being turned on, after which the tenant no longer heard the victim's voice. The argument between

14

defendant and the victim, which had lasted approximately one hour, ceased. The tenant never saw the victim again.

Defendant presented the testimony of one witness, a friend he had known since childhood. The friend testified defendant had never been gay. In fact, he was once married and had a child. The friend visited defendant at the victim's apartment twice and he and defendant got drunk. During the visits, he heard the victim claim to be defendant's boyfriend. The statement made defendant angry. The friend explained that defendant had been homeless and at times lived with the victim. According to the childhood friend, defendant had come to his home in the morning of the day he was arrested. The friend could not recall the exact time. He thought it was approximately 9:00 a.m. Defendant was very drunk.

## II.

Defendant appeals and raises the following arguments:

### POINT I

THE COURT'S FAILURE TO CHARGE THE LESSER-INCLUDED OFFENSES OF AGGRAVATED MANSLAUGHTER AND PASSION/PROVOCATION MANSLAUGHTER AT DEFENDANT'S REQUEST WAS REVERSIBLE ERROR.

### POINT II

THE ADMISSION OF HEARSAY STATEMENTS OF THE VICTIM RECOUNTING ABUSE BY DEFENDANT WAS AN ABUSE OF DISCRETION AND DEPRIVED DEFENDANT OF A FAIR TRIAL. (Not raised below).

## POINT III

IMPROPER REFERENCES TO DEFENDANT'S PRE-ARREST SILENCE VIOLATED MR. GARCIA'S RIGHT AGAINST SELF-INCRIMINATION. (Not raised below).

## POINT IV

THE ADMISSION OF GRUESOME AND INFLAMMATORY PHOTOGRAPHS DEPRIVED DEFENDANT OF A FAIR TRIAL. (Not raised below).

## POINT V

THE OVERZEALOUSNESS OF THE PROSECUTOR FROM HIS OPENING STATEMENT TO HIS SUMMATION DENIED DEFENDANT A FAIR TRIAL. (Not raised below).

## POINT VI

THE DEFENDANT'S STATEMENT TO POLICE SHOULD NOT HAVE BEEN ADMITTED INTO EVIDENCE BECAUSE IT WAS NOT KNOWING AND VOLUNTARY. (Not raised below).

## POINT VII

THE TESTIMONY OF DET. BRAZOFSKY EXPRESSING AN OPINION THAT THE DEFENDANT WAS LYING WAS IMPERMISSIBLE OPINION TESTIMONY WHICH REQUIRES REVERSAL OF DEFENDANT'S CONVICTION. (Not raised below).

## POINT VIII

THE AGGREGATE SENTENCE IMPOSED UPON THE DEFENDANT OF SIXTY YEARS WITH FORTY TWO AND ONE HALF YEARS OF PAROLE INELIGIBILITY WAS EXCESSIVE AND SHOULD BE MODIFIED AND REDUCED. (Not raised below).

## POINT IX

THE AGGREGATE OF ERRORS DENIED DEFENDANT A FAIR TRIAL. (Not raised below).

Defendant raises five of his first six arguments for the first time on appeal. As the Supreme Court has explained, "[a]ppellate review is not limitless." State v. Robinson, 200 N.J. 1, 19 (2009). Rather, "the points of divergence developed in proceedings before a trial court define the metes and bounds of appellate review." Ibid. For that reason, the Supreme Court has "insisted that, in opposing the admission of evidence, a litigant must 'make known his position to the end that the trial court may consciously rule upon it.'" Ibid. (quoting State v. Abbott, 36 N.J. 63, 76 (1961)).

Indisputably, "our Rules envision the making of contemporaneous objections as the principal and almost exclusive means of preserving an issue for appeal." Id. at 20 (citing R. 1:7-2). There are exceptions. For example, Rule 2:10-2 empowers an "appellate court . . . , in the interests of justice, [to] notice plain error not brought to the attention of the trial or appellate court." Under the plain-error standard, "an appellate court can reverse only if it finds that the error was 'clearly capable of producing an unjust result.'" State v. Pressley, 232 N.J. 587, 593 (2018) (quoting R. 2:10-2; Stair v. Cole, 229 .S. 430, 458 (2017)). The plain error standard, however, is "not intended to supplant the obvious need to create a complete record and to preserve issues for appeal. To permit otherwise would

allow the . . . standard . . . to render as mere surplusage the overarching requirement that matters be explored first and fully before a trial court." Robinson, 200 N.J. at 20.

With these principles in mind, we turn to defendant's arguments.

### III.

We first address defendant's argument in Point VI that his confession should have been suppressed because he did not voluntarily, knowingly, and intelligently waive his Miranda[3] rights before confessing to police during his custodial interrogation. Defendant does not dispute that the detectives, who spoke fluent Spanish, read him his Miranda rights, and he signed a form waiving those rights. Indeed, he conceded at the suppression hearing the detectives properly informed him of his rights. Rather, defendant asserts in conclusory fashion he "did not fully understand everything." As evidence of his alleged lack of understanding, he points to his writing "Pedro" instead of initialing the waiver of rights form. He also argues for the first time on appeal that though authorities had not charged him with any crimes before he confessed, his statement was not

---

[3] Miranda v. Arizona, 384 U.S. 436 (1966).

knowingly made because he was not informed that he would be charged with murder. Neither argument has merit.

The State called three witnesses at the suppression hearing. Defendant called none. The State presented the testimony of Cliffside Park Detective Sergeant MacKay and Special Police Officer Jesus Garcia. Neither testified about defendant's confession to Bergen County Prosecutor's detectives. Both testified about statements defendant made on Sunday when the case was one involving a missing person.

Detective Brazofsky, one of the Bergen County Prosecutor's detectives to whom defendant confessed, testified about the circumstances of defendant's confession. The State also introduced a DVD of the interview and a transcript — in English — of the recording.

Detective Brazofsky became involved in the investigation after the victim's body parts were discovered. During the course of the investigation, co-defendant was interviewed and implicated defendant as one of the killers. On Tuesday, the day after the victim's body parts were found, detectives picked up defendant at approximately 1:40 p.m. and brought him to the Bergen County Prosecutor's Office. Defendant was escorted to a video-equipped interview room and given food and a bottle of water. The video equipment was activated. Defendant used the bathroom before the

interview began. Detective Brazofsky, along with Detective Michael Guzman, were assigned to conduct the interview with defendant because defendant and both detectives spoke Spanish.

The interview began at approximately 3:05 p.m. Detective Brazofsky utilized the Spanish language version of the Bergen County Prosecutor's Office Miranda rights form. After filling out the date and time on the form, Detective Brazofsky explained to defendant that he had certain rights, which the detective was required to read before interviewing him. He then asked defendant if he could read Spanish and defendant replied "yes." Detective Brazofsky then read the entire introduction followed by each of the Miranda warnings.

After the detective read each warning, defendant verbally answered that he understood. Detective Brazofsky then gave the form to defendant, asked him to read it, and to print "yes" if he understood each right. The detective explained that if there was anything defendant did not understand, the detective would explain it further. According to the detective, defendant read the form and wrote "sí", Spanish for "yes," and his name, "Pedro," after each right.

Detective Brazofsky next read to defendant the "waiver" portion of the form. Defendant said he understood. The detective asked if defendant was still willing to speak to them, and

defendant replied that he was ready. Defendant signed the form, although he signed it on the witness line.

Defendant then gave a lengthy statement, which we have previously summarized. The interview, which was approximately three hours long, ended around 6:00 p.m. Defendant took several cigarette breaks during the course of the interview. Following the interview, the detective charged defendant with murder.

According to Detective Brazofsky, defendant did not appear to be under the influence of alcohol or drugs when he gave the statement. Defendant did appear to be hungry, which is why the detective gave him something to eat before the interview began. As defendant was reviewing the Miranda form, he asked Detective Guzman if he should read the form aloud. Detective Guzman responded defendant could do whatever he liked or however he wished to proceed. Defendant did not read the form aloud.

Following the hearing on defendant's motion to suppress his confession, the trial judge issued a written opinion. Referring to the testimony the State adduced at the hearing, the DVD of the interview, the transcripts of the interview, and the exhibits admitted during the hearing, the court found defendant voluntarily, knowingly, and intelligently waived his Miranda rights and confessed. The court explained:

21

Here, the defense argues that the defendant could not have made a knowing, intelligent, and voluntary waiver of his _Miranda_ rights because he did not know how to read Spanish and in turn, could not actually comprehend the meaning behind each _Miranda_ right. However, looking at the totality of the circumstances, it is evident that the defendant did in fact make a knowing, intelligent, and voluntary waiver of his _Miranda_ rights. It was clear from the investigation leading up to the interview that the defendant's primary language was Spanish. At the beginning of the interview with the defendant, the Spanish-speaking detectives asked the defendant on two separate occasions whether he could read Spanish to ensure the defendant's understanding of Spanish. Detective Brazofsky asked the defendant in Spanish, "Okay, you read, do you read, uh, in Spanish?" and received an answer of "yes" from the defendant. A very short time later, Detective Guzman asked the defendant in Spanish, "Do you know how to read Spanish?" in which the defendant responded with "yes."

After this inquiry by the detectives, the defendant was explicitly advised of each and every _Miranda_ right that was listed on the Spanish _Miranda_ form before any formal questioning. Detective Guzman read the _Miranda_ rights form out loud to the defendant and then allowed the defendant to read the form himself. Once the defendant admitted that he understood each of the rights, he answered "sí" and signed his name next to each right. Defendant read the form and asked the detectives if he should write his full name (Pedro Angel Garcia) on the form.

Moreover, there is additional evidence to show that there was no use of deception or police coercion with the defendant. Before the interview started, the detectives informed the defendant that they wanted to discuss the

disappearance of the victim and the defendant was also provided with a sufficient amount of food and drink. During questioning, the detectives granted the defendant cigarette breaks when requested and kept a passive, non-aggressive tone with the defendant. It appears that the defendant stayed relatively calm answering the questions of the detectives and only became offended when he was asked whether or not he was gay and had a romantic relationship with [the victim]. Furthermore, the defendant was not agitated and meticulously ate his pizza slices while cleaning his mouth and table of crumbs.

[citations omitted].

Our review of the factual findings of the trial court is deferential. State v. Scriven, 226 N.J. 20, 32 (2016). That is particularly so as "to those findings of the trial judge which are substantially influenced by his opportunity to hear and see the witnesses and to have the 'feel' of the case, which a reviewing court cannot enjoy." State v. Johnson, 42 N.J. 146, 161 (1964). If our review satisfies us the trial court's findings could reasonably have been reached on sufficient, credible evidence present in the record, our task is complete and we should not disturb the result. Id. at 162. Our review of the trial court's legal conclusions is plenary. State v. Rockford, 213 N.J. 424, 440 (2013).

Defendant's argument that he "did not fully understand everything," as evidenced by his writing his name rather than his

23

initials on the <u>Miranda</u> form, overlooks both the contrary testimony the State developed, which is overwhelming, and the trial court's factual findings, which are fully supported by sufficient, credible evidence. Such evidence included defendant's responsiveness to the detectives' questions, defendant's acknowledgement that he could read the <u>Miranda</u> form, and his execution of the <u>Miranda</u> waiver form. Defendant's argument is meritless.

Defendant's other argument — that he did not knowingly waive his <u>Miranda</u> rights because detectives did not inform him he would be arrested for murder — is also meritless. In <u>State v. A.G.D.</u>, the Supreme Court held a defendant's <u>Miranda</u> waiver was invalid because the police did not inform him before beginning his interrogation that they had an outstanding criminal complaint and warrant for his arrest. 178 N.J. 56, 68 (2003). In <u>State v. Nyhammer</u>, however, the Court explained that its holding in <u>A.G.D.</u> was "not to be construed as altering existing case law . . . other than imposing the basic requirement to inform an interrogatee that a criminal complaint or arrest warrant has been filed or issued." <u>Nyhammer</u>, 197 N.J. 383, 405 (2009) (alteration in original) (quoting <u>A.G.D.</u>, 178 N.J. at 68-69). Thus, even if defendant had raised the issue before the trial court, it would have been to no avail. Moreover, under the totality of the circumstances, it can

24

hardly be said that not informing defendant he was a suspect in the murder case or would be charged with murder would have rendered invalid his otherwise voluntary, knowing, and intelligent <u>Miranda</u> waiver.

IV.

We have considered defendant's arguments in Points II through V and VII in light of the record and applicable legal principles and concluded they are without sufficient merit to warrant extended discussion. <u>R.</u> 2:11-(e)(2). We add only these brief comments. Even if, as defendant contends in Point II, the trial court abused its discretion by admitting the two hearsay statements given by the victim's sister and a neighbor concerning defendant's previous abuse of the victim, the fleeting references did not have the capacity to produce an unjust result. This is particularly so in light of another neighboring apartment owner's testimony that she witnessed defendant physically abuse the victim and in view of the overwhelming quantitative and qualitative evidence of defendant's guilt. Indeed, as defendant concedes in his brief "[t]his was a particularly strong case for the State."

Defendant's argument in Point III concerning his pre-arrest silence — on Sunday night, in the victim's apartment, in the face of the sister's insistence to look through the knife drawer — is based on a misinterpretation of the law. In New Jersey, a

prosecutor may not "use at trial a defendant's silence when that silence arises 'at or near' the time of arrest, during official interrogation, or while in police custody." State v. Muhammad, 182 N.J. 551, 569 (2005) (citing State v. Deatore, 70 N.J. 100, 108-09 (1976)). Here, defendant was silent not at or near the time of his arrest, nor while in police custody, but rather two days before his arrest, in the apartment where he lived, while the police were in the preliminary stages of a missing person investigation. And the silence did not occur in the face of police interrogation, but rather during an argument with the missing person's sister.

Contrary to defendant's argument in Point IV, the trial court did not abuse its discretion by admitting the photographs of defendant's crime, State v. Brown, 170 N.J. 138, 147 (2000), particularly in the absence of an objection. Moreover, we fail to discern how the admission of photographic evidence was clearly capable of producing an unjust trial result in view of the graphic testimony of the medical examiner and law enforcement officers who examined the victim's dismembered body parts — all of which was necessary for the State to prove the elements of the crimes with which defendant was charged.

Nor was it error for Detective Brazofsky to testify how he knew defendant was lying during the interrogation, as defendant

argues in Point VII. The detective was doing nothing more than explaining how defendant's initial statements were contrary to facts developed during the investigation. In some instances, the contrast was blatant. In any event, the testimony was harmless. The State presented overwhelming, independent evidence that defendant lied to police, not only when he initially denied culpability during the custodial interrogation, but also two days earlier when he told police that during the Saturday night party the victim had been punched and later left the apartment with others, probably to go to a gay bar in New York.

Last, defendant's claims in Point V of prosecutorial misconduct are unavailing. Defendant takes exception to the prosecutor presenting certain evidence: how the victim and his siblings illegally entered the United States; defendant's pre-arrest silence; gruesome photographs; and hearsay testimony. Defendant also claims the prosecutor made an inflammatory and unduly prejudicial closing argument. We have discussed most of the claims concerning testimonial evidence. As to the prosecutor's summation, the absence of a timely defense objection signifies that the remarks were not prejudicial. See State v. Ramseur, 106 N.J. 123, 323 (1987). Considered in the context of the tenor of the trial and the State's abundant evidence, the prosecutor's

27

remarks did not constitute misconduct let alone reversible error. State v. Timmendequas, 161 N.J. 515, 575 (1999).

## V.

In Point I, defendant argues the trial court erred when it denied defendant's request to instruct the jury on the lesser-included offenses of aggravated manslaughter and passion/provocation manslaughter. We disagree.

An offense is a lesser-included offense when:

> (1) It is established by proof of the same or less than all the facts required to establish the commission of the offense charged; or
>
> (2) It consists of an attempt or conspiracy to commit the offense charged or to commit an offense otherwise included therein; or
>
> (3) It differs from the offense charged only in the respect that a less serious injury or risk of injury to the same person, property or public interest or a lesser kind of culpability suffices to establish its commission.
>
> [N.J.S.A. 2C:1-8(d).]

A trial court "shall not charge the jury with respect to an included offense unless there is a rational basis for a verdict convicting the defendant of the included offense." N.J.S.A. 2C:1-8(e).

In view of these statutory sections, when an appellate court reviews a trial court's denial of a defendant's request for a charge on a lesser-included offense, the appellate court must determine "whether 'the evidence presents a rational basis on which the jury could [1] acquit the defendant of the greater charge and [2] convict the defendant of the lesser.'" State v. Carrero, 229 N.J. 118, 128 (2017) (quoting State v. Brent, 137 N.J. 107, 117 (1994)). "If such a rational basis exists, a trial court's failure to give the requested instruction is reversible error." Ibid. (citing Brent, 137 N.J. at 118).

An actor commits aggravated manslaughter when "[t]he actor recklessly causes death under circumstances manifesting extreme indifference to human life." N.J.S.A. 2C:11-4(a)(1). An actor commits passion/provocation manslaughter when the actor commits "[a] homicide which would otherwise be murder . . . in the heat of passion resulting from a reasonable provocation." N.J.S.A. 2C:11-4(b)(2). Aggravated manslaughter is a lesser-included offense of murder, State v. Galicia, 210 N.J. 364, 400 (2012) (citation omitted), as is passion/provocation manslaughter, State v. Robinson, 136 N.J. 476, 482 (1994) (citation omitted). Thus, the question presented in this appeal is whether there was a rational basis on which the jury could have acquitted defendant

of murder and convicted him of either aggravated manslaughter or passion/provocation manslaughter. We think not.

Defendant told police that while Sanchez was asleep, the victim "touched" him and began undoing Sanchez's belt. Sanchez woke up, became angry, shoved the victim to the floor and punched him. When defendant attempted to calm Sanchez, Sanchez said, "we have to kill him. We have to finish him." In response, defendant went into the kitchen, grabbed a knife, returned, and stabbed the victim once in the neck, inflicting the wound that proved fatal. Before the victim died, however, defendant and Sanchez put him in the bathtub, ignoring his pleas for his life. As the co-defendant disemboweled the victim, they watched him die.

Based on defendant's account of the homicide, there was no rational basis for the jury to acquit him of murder. A defendant commits murder when he "purposely causes death or serious bodily injury resulting in death," or "knowingly causes death or serious bodily injury resulting in death." N.J.S.A. 2C:11-3(a)(1) and (2).

Defendant, by his own admission, stabbed the victim in the neck in response to Sanchez saying, "we have to kill him. We have to finish him." Defendant then disregarded the victim's pleas for life and disemboweled him. Under those circumstances, there was

no rational basis for the jury to conclude defendant did not either purposely or knowingly kill the victim.

Nor was there any evidence that would have supported a theory that defendant stabbed the victim in the neck and disemboweled him "in the heat of passion resulting from a reasonable provocation." N.J.S.A. 2C:11-4(b)(2).

Defendant asserts the cause of death was a single stab wound to the neck that severed the victim's jugular vein. Based on the testimony of a neighboring tenant, defendant argues that "[p]rior to the stab wound, the victim and the defendants were arguing for more than one hour. Banging could be heard similar to moving furniture." Defendant also points out the victim had "superficial facial bruises as if in a fight." He adds, "[c]apping it all was that there had been a party at which substantial liquor had been consumed as evidenced by the number of beer bottles recovered." Defendant asserts, "[b]ased on this factual scenario, there was a rational basis for a jury charge on aggravated manslaughter." Based on the same evidence, defendant asserts there was a rational basis for passion/provocation manslaughter.

Defendant neither disputes nor refutes that he walked away from the victim and Sanchez, retrieved a knife from the kitchen, returned, and stabbed the victim in the neck, severing his jugular vein, all in response to Sanchez saying "we have to kill him."

Moreover, even if somehow the record could be construed to demonstrate defendant was acting only recklessly — as opposed to knowingly or intentionally — when he stabbed the victim in the neck, defendant transporting the victim to the bathtub and disemboweling him negates any rational basis for such a conclusion. Moreover, there was no rational basis for concluding defendant acted in the heat of passion resulting from a <u>reasonable</u> provocation.

In short, no evidence provided a rational basis for the jury to acquit defendant of murder and convict him of either aggravated manslaughter or passion/provocation manslaughter.

### VI.

In Point VIII, defendant challenges his sentence as excessive. He contends the court gave too little weight to his cooperation with the State by testifying at Sanchez's trial. We are unpersuaded. A defendant's disagreement with the weight a sentencing court gives to aggravating and mitigating factors, N.J.S.A. 2C:44-1, is not a basis for reversing a sentence. Here, the sentencing record both establishes the trial court followed the sentencing guidelines and supports the court's findings of aggravating and mitigating factors. Under those circumstances, we will only reverse if the sentence "shock[s] the judicial conscience" in light of the particular facts of the case. <u>State</u>

v. Roth, 95 N.J. 334, 364-65 (1984).  Considering the particular facts of this case, the sentence does not shock the judicial conscience.

## VII.

In summary, the reasons the trial court denied defendant's motion to suppress his confession to Bergen County Prosecutor's Office detectives were amply supported by credible evidence in the motion record.  The errors defendant alleges occurred as the State presented its case at trial, considered separately or collectively, were not clearly capable of producing an unjust result.  There was no rational basis to support a jury charge on either aggravated or passion/provocation manslaughter, and defendant's sentence does not shock the judicial conscience.  For these reasons, we affirm defendant's conviction and sentence.

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION